ORIGINAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO, WESTERN DIVISION**

Northern Ohio Surgical Center, LLC,

Plaintiff,

vs.

ASC Group, LC and ASC Management, L.L.C.

Defendants.

Case No.: 3:01CV7269

Judge: JUDGE JAMES G. CARR

**NOTICE OF REMOVAL**

Stephen B. Mosier (0019769)
Roetzel & Andress
One SeaGate, Suite 999
Toledo, OH 43604
Telephone: (419) 242-7985
Facsimile: (419) 242-0316

Counsel for Defendants ASC Group, LC and ASC Management, L.L.C.

NOW COME ASC Group, LC and ASC Management, L.L.C., Defendants in the above-captioned case, and respectfully petition this Court for removal from the Court of Common Pleas of Erie County, Ohio, of the case which is now pending as Case No. 2001-CV-224. Petitioners seek removal to the United States District Court for the Northern District of Ohio, Western Division, pursuant to 28 U.S.C. §1441. No further proceedings have commenced on this action in the Court of Common Pleas of Erie County, and this matter is petitioned for timely removal pursuant to the 30 day requirement of 28 U.S.C. §1446(b). All Defendants join in this petition for removal.

28 U.S.C. §1441 provides, in relevant part, as follows:

> (a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. ...

This court has original jurisdiction over the above-captioned case pursuant to 28 U.S.C. §1332, since the Plaintiff is diverse from both Defendants, and the amount in controversy as pleaded in ¶15 of Plaintiff's complaint is in excess of $75,000. This Court therefore has original jurisdiction over all claims brought in Plaintiff's Complaint, by operation of 28 U.S.C. §1441(a).

A copy of Plaintiff's complaint is attached to this Notice as Exhibit "A" and is incorporated herein by reference. Attached as Exhibit "B" is a copy of the Notice of Filing of Removal, which Defendants will promptly file with the Clerk of the Court of Common Pleas of Erie County and serve upon all adverse parties immediately after filing this Notice of Removal pursuant to 28 U.S.C. §1446(a).

**WHEREFORE**, Defendants respectfully request that the above-captioned case be removed from the Court of Common Pleas of Erie County, Ohio to the United States District Court for the Northern District of Ohio, Western Division.

Dated this 30th day of May, 2001, and signed below in accordance with Rule 11 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Stephen B. Mosier (0019769)
Attorney for Defendants ASC Group, LC
And ASC Management, L.L.C.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Notice of Removal has been served via ordinary first class, United States Mail, postage prepaid, this 30th day of May, 2001, upon Gerardo R. Rollison, Esq., Cooper & Walinski, L.P.A., 900 Adams Street, Toledo, OH 43624, counsel for plaintiff Northern Ohio Surgical Center, LLC.

Stephen B. Mosier (0019769)
An Attorney for Defendants ASC Group, LC and ASC Management, L.L.C.

38836_1

## IN THE COURT OF COMMON PLEAS, ERIE COUNTY, OHIO

**Northern Ohio Surgical Center, LLC**
2800 Hayes Avenue, Building E
Sandusky, OH 44870

Plaintiff,

vs.

**ASC Group, LC**
a Utah limited liability company
c/o CT Corporation System
1300 East Ninth Street
Cleveland, OH 44114

and

**ASC Management, L.L.C.**
a Utah limited liability company
c/o CT Corporation System
1300 East Ninth Street
Cleveland, OH 44114

Defendants.

Case No.

Judge

**COMPLAINT WITH JURY DEMAND**

Gerardo R. Rollison (0027088)
David Rodman Cooper (0065427)
COOPER & WALINSKI, L.P.A.
900 Adams Street
Toledo, Ohio 43624
Telephone: (419) 241-1200
Fax: (419) 242-7212

Counsel for Plaintiff

* * * * * * * * * * * * * * * * *

## GENERAL ALLEGATIONS

1. Plaintiff, Northern Ohio Surgical Center, LLC ("NOSC") is a limited liability company organized under the laws of the State of Ohio.

2. Defendant ASC Group, LC ("ASC Group") is a limited liability company organized under the laws of the State of Utah.

ALL-STATE LEGAL EXHIBIT A

3. Defendant ASC Management, L.L.C. ("ASC Management") is a limited liability company organized under the laws of the State of Utah.

4. NOSC was formed for the purpose of developing, owning, and operating a multi-speciality ambulatory surgery center to be located in Sandusky, Ohio.

5. In late 1998, Defendant ASC Group contacted NOSC, and offered to assist NOSC in the development and management of the surgery center.

6. Upon information and belief, Defendant ASC Group is in the business of developing surgery centers and providing management for the centers through its affiliate, Defendant ASC Management.

7. In late 1998 and early 1999, Defendant ASC Group represented to NOSC, that ASC Group would provide essentially a "turn key" operation for NOSC, promising to take care of everything related to the development, construction, financing, and management of the surgery center.

8. Defendant ASC Group provided a project time line to NOSC for work to be performed by ASC Group in connection with the project.

9. On January 7, 1999, Defendant ASC Group provided a Private Placement Memorandum outlining details of the project, including the fact that Defendant ASC Group would, among other services, provide for the day to day management, accounting and cash management, personnel supervision, purchasing, marketing services, management of payor contracting and relations, and other accounting and tax services for the surgery center.

10. Thereafter, NOSC adopted its amended and restated Operating Agreement, an unsigned copy of which is attached as Exhibit A.

11. NOSC, Defendant ASC Group, and Defendant ASC Management also entered into a "Development and Management Agreement," a copy of which is attached as Exhibit B.

12. The Development and Management Agreement was incorporated into the Operating Agreement, and was to be an agreement whereby ASC Management manages "the development and day-to-day operations" of the surgery center. (See Exhibit A at ¶ 2.1.35.)

13. The Development and Management Agreement specifically provides that Defendant ASC Group agreed to perform all services for NOSC involving the development and management of the surgery center, including several specifically enumerated services. (See, "Exhibit A" to the Development and Management Agreement, Exhibit B at ¶ 1.2.)

14. Furthermore, under the Development and Management Agreement, ASC Management agreed to perform numerous tasks including the preparation and maintenance of accounting and financial records, budget, and personnel administration. (See, Development and Management Agreement, Exhibit B at ¶1.6.)

15. In exchange for the services to be performed by Defendant ASC Group to develop and oversee the set up of the surgery center, Defendant ASC Group was to receive the sum of $302,500. (See, Development and Management Agreement, Exhibit B at ¶ 6.1(a).)

16. In addition, Defendant ASC Management was to receive a fee in exchange for its performance of services under the agreement. (See Development and Management Agreement, Exhibit B at ¶ 6.1(b).)

17. Both Defendants ASC Group and ASC Management have breached the Development and Management Agreement, and having failed to perform their required duties, causing damages to NOSC.

## FIRST CLAIM FOR RELIEF — BREACH OF CONTRACT

18. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 17 above as if fully rewritten herein.

19. Under the Development and Management Agreement, Defendants ASC Group and ASC Management agreed to provide services to NOSC, including an agreement to perform all "pre-operations business development tasks" and "to conduct, supervise and direct the day to day operations of the center." (See Exhibit B, at ¶¶ 1.2 and 1.6.)

20. Defendant ASC Group failed in its obligation to perform necessary business development tasks, and instead of providing NOSC a "turn key" operation as promised, Defendant ASC Group essentially abandoned NOSC and provided virtually no services of value, leaving NOSC to perform the services promised by ASC.

21. Specifically ASC Group failed to secure non-recourse financing as required; ASC Group failed to hire and train appropriate personnel; ASC Group failed to adequately oversee construction of the facility; ASC Group failed to timely address construction defects, and failed to provide an accounting of funds after repeated requests.

22. As a result of these breaches, and others, by Defendants ASC Group and ASC Management, NOSC has had to incur significant expenses and diversions of resources to perform the functions that were to be performed by ASC Group.

23. In addition, Defendant ASC Group failed to perform other necessary business development tasks including their failure to contract with insurance companies as required; their failure to provide up-to-date and reasonably priced equipment as required; their failure to provide appropriate architectural design for the facility as required; their failure to place NOSC into a

commercially reasonable lease agreement; and their failure to accurately identify shareholders and issue stock certificates in NOSC as required.

24. Defendant ASC Group also breached the agreement as it relates to management services to be performed by Defendant ASC Management.

25. Neither ASC Group nor ASC Management has performed its management duties under the contract.

26. Specifically, ASC Group and ASC Management have failed to keep accurate accounting and financial records as required under ¶ 1.6(b) of the Development and Management Agreement, (Exhibit B); have failed to develop appropriate budgets as required by ¶ 1.6(c) of the Development and Management Agreement, (Exhibit B); have failed to hire and train appropriate personnel as required by ¶ 1.6(d) of the Development and Management Agreement; and have failed to handle the accounts of NOSC as required.

27. In addition to the foregoing, ASC Group and ASC Management failed in their obligation to pay accounts as required by ¶ 1.6(h) of the Development and Management Agreement (Exhibit B). This failure to pay numerous vendors has tarnished the name of NOSC in the Sandusky Community.

28. In addition, ASC Group and ASC Management breached its obligation to prepare mandatory governmental filings on behalf of NOSC.

29. Defendants ASC Group and ASC Management have also engaged in a pattern of conduct whereby ASC Group and ASC Management would convert NOSC's funds without authority. Specifically, NOSC has paid for equipment that was never received, and has paid financing fees

for financing that was never obtained; and ASC Group and ASC Management charged NOSC for over $37,000 in "travel expenses" for which ASC Group cannot account.

30. Moreover, ASC Group's failure to perform its business development obligations in a timely manner caused a delay in the opening of the surgery center and an increase in the development and construction costs, which have caused financial damages to NOSC. NOSC notified ASC Group and ASC Management of their material breach of the Development and Management Agreement on August 23, 2000 and on other occassions.

31. Instead of attempting to cure their breaches, ASC Group and ASC Management continued in their abandonment of NOSC.

32. As a result of the breach of the Development and Management Agreement by Defendants, NOSC is entitled to compensatory damages.

33. NOSC is also entitled to purchase the units of ownership held by ASC Group in accordance with Article XIII ("Buy-Sell") of the Operating Agreement, (Exhibit A).

**SECOND CLAIM FOR RELIEF — MISREPRESENTATION**

34. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 33 above as if fully rewritten herein.

35. Defendants ASC Group and ASC Management negligently and/or intentionally provided false information to NOSC respecting the intent and ability of Defendants to develop and manage a surgery center.

36. Furthermore, Defendants ASC Group and ASC Management either negligently or intentionally misrepresented the extent and scope of services that they would provide to NOSC in connection with the development and management of the surgery center in Sandusky, Ohio.

37. Defendants ASC Group and ASC Management made the false statements to NOSC for the purpose of inducing NOSC to contract with and hire ASC Group and ASC Management to develop and manage the surgery center.

38. NOSC did in fact rely to its detriment on the false statements of ASC Group and ASC Management by entering into, among other agreements, the Development and Management Agreement attached as Exhibit B.

39. NOSC has been harmed by its reliance on Defendants' misrepresentations by relying on ASC Group for the development of the surgery center. ASC Group and ASC Management did not provide the services that it represented to NOSC that it would provide, causing NOSC to incur substantial economic damages to develop the center on its own.

WHEREFORE, Plaintiff Northern Ohio Surgical Center, LLC, respectfully requests that this honorable court grant judgment in its favor and against Defendants ASC Group, LC and ASC Management, LLC., jointly and severally, and award to Plaintiff its compensatory damages in an amount in excess of $25,000, punitive damages in an excess of $25,000, costs and attorneys fees incurred herein, applicable interest, and such other relief as this court shall deem appropriate.

Respectfully submitted,

COOPER & WALINSKI, L.P.A.

By: [signature]
Gerardo R. Rollison
Counsel for Plaintiff

TO THE CLERK:

Plaintiff hereby demands a trial by jury.

By: [signature]
Gerardo R. Rollison
Counsel for Plaintiff

ALL-STATE LEGAL®
EXHIBIT
A

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# NORTHERN OHIO CENTER FOR OUTPATIENT SURGERY, LTD.

THIS OPERATING AGREEMENT of Northern Ohio Center for Outpatient Surgery, Ltd. (the "Company"), a limited liability company organized pursuant to the Ohio Limited Liability Company Act (the "Act"), is executed effective as of February __, 1999, by and among the Company and all of its Members (as defined below).

## ARTICLE I - FORMATION OF THE COMPANY

1.1 **Formation.** The Company was formed upon the filing with the Office of the Ohio Secretary of State (the "Secretary") of the Articles of Organization of the Company. In consideration of the mutual premises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the rights and obligations of the parties and the administration and termination of the Company shall be governed by this Agreement, the Articles of Organization and the Act.

1.2 **Name.** The name of the Company is Northern Ohio Center for Outpatient Surgery, Ltd. The Members may change the name of the Company from time to time, as they deem advisable, provided appropriate amendments to this Agreement and the Articles of Organization and necessary filings under the Act are first obtained.

1.3 **Registered Office and Statutory Agent.** The Company's registered office within the State of Ohio and its statutory agent at such address shall be as the Board of Managers may from time to time deem necessary or advisable.

1.4 **Principal Place of Business.** The principal place of business of the Company shall be at such place or places as the Board of Managers shall from time to time deem necessary or advisable.

1.5 **Purposes and Powers.**

(a) The purposes and business of the Company shall be (i) to develop, own and operate an ambulatory surgical facility in the Sandusky and Eric County, Ohio area which is appropriately licensed by the necessary Ohio and federal authorities having jurisdiction over ambulatory surgical facilities of the type to be operated by the Company; and (ii) to engage in any such lawful business which a limited liability company may pursue under the Act.

(b) The Company shall have any and all powers that are necessary or desirable to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Act.

**1.6 Term.** The Company shall continue in existence for a period of 50 years from the date of its formation, unless the Company is earlier dissolved and its affairs wound up in accordance with the provisions of this Agreement or the Act.

**1.7 Nature of Members' Interests.** The interests of the Members in the Company shall be personal property for all purposes. Legal title to all Company assets shall be held in the name of the Company. Neither any Member nor a successor, representative or assign of such Member, shall have any right, title or interest in or to any Company property or the right to partition any Property owned by the Company.

## ARTICLE II - DEFINITIONS

~~1.1~~2.1 **Definitions.** The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

~~1.1.1~~2.1.1 "Act" means the Ohio Limited Liability Company Act, as the same may be amended from time to time.

~~1.1.2~~2.1.2 "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts to which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) Debit to such Capital Account the items described in Sections 1.704-l(b)(2)(ii)(d)(4), 1.704-l(b)(2)(ii)(d)(5), and 1.704-l(b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-l(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

~~1.1.3~~2.1.3 "Adjusted Capital Contributions" means, as of any day, a Member's Capital Contributions adjusted as follows:

(i) Increased by the amount of any Company liabilities which, in connection with Distributions, are assumed by such Member or are secured by any Property distributed to such Member, and

(ii) Reduced by the amount of cash and the Gross Asset Value of any Property distributed to such Member and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

In the event any Member transfers all or any portion of its Membership Interest in accordance with the terms of this Agreement, the Member's transferee shall succeed to the Adjusted Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest or portion thereof.

~~1.1.4~~2.1.4 "Affiliate" of a specified Person means (i) any Person directly or indirectly controlling, controlled by or under common control with the specified Person; (ii) any officer, director, member, or partner of the specified Person; or (iii) any entity if the specified Person is an officer, director, member, partner, or employee, of the entity for which the specified Person acts in such capacity. .

~~1.1.5~~2.1.5 "Agreement" means this Operating Agreement, as amended from time to time.

~~1.1.6~~2.1.6 "Articles of Organization" means the Articles of Organization of the Company filed with the Secretary, as amended or restated from time to time.

~~1.1.7~~2.1.7 "ASC" means ASC Group, LC, a Utah limited liability company.

~~1.1.8~~2.1.8 "ASC Management" means ASC Management, L.L.C., also a Utah limited liability company and an affiliate of ASC.

~~1.1.9~~2.1.9 "Board of Managers" means the board that shall manage the business of the Company pursuant to Article VI of this Agreement. The Board of Managers is also sometimes referred to herein as the "Board."

~~1.1.10~~2.1.10 "Board Member" means a member of the Board of Managers of the Company as elected or appointed from time to time pursuant to Section 4.5 of this Agreement.

~~1.1.11~~2.1.11 "Buy-Sell Event" shall have the meaning ascribed to it in Article XIII herein below.

~~1.1.12~~2.1.12 "Buy-Sell Notice" means the notice to be delivered by a Member or with respect to whom a Buy-Sell Event has occurred or by such Member's representative.

~~1.1.13~~2.1.13 "Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with Section 9.5 of this Agreement.

~~1.1.14~~2.1.14 "Capital Contribution" means all contributions of cash or property (valued for this purpose at initial Gross Asset Value) made by a Member or its predecessor in interest.

~~1.1.15~~2.1.15 "Capital Transaction" means any transactions undertaken by the Company or by any entity in which the Company owns an interest, which, were it to generate proceeds, would produce Company Sales Proceeds or Company Refinancing Proceeds.

~~1.1.16~~2.1.16 "Cash Flow" for any period means the excess, if any, of (A) the sum of (i) all gross receipts from any source for such period, other than from Company loans, Capital Transactions and Capital Contributions, and (ii) any funds released by the Company from previously established reserves, over (B) the sum of (i) all cash expenses paid by the Company for such period, (ii) all amounts paid by the Company in such period on account of the amortization of the principal of any debts or liabilities of the Company (including loans from any Member), (iii) capital expenditures of the Company and (iv) a reasonable reserve for future expenditures as provided by Section 6.1.1; provided, however, that the amounts referred to in (B) (i), (ii) and (iii) above shall be taken into account only to the extent not funded by Capital Contributions, loans or payments out of previously established reserves. Such term shall also include all other funds deemed available for distribution and designated as Cash Flow by the Board.

~~1.1.17~~2.1.17 "Class I Units" means those Membership Interests consisting of at least 70 Units offered exclusively to surgeons, physician specialists or medical entities wholly owned and operated by surgeons or physician specialists, plus ten (10) authorized Units which will not be issued initially, but reserved for issuance by the Board of Managers at a later time.

~~1.1.18~~2.1.18 "Class II Units" means those Membership Interests consisting of up to 15 Units, which will be issued to Persons who contributed funds to cover the Company's organizational expenses and start-up costs.

~~1.1.19~~2.1.19 "Class III Units" means those Membership Interests consisting of up to 15 Units, which will be offered to ASC.

~~1.1.20~~2.1.20 "Code" means the Internal Revenue Code of 1986, as amended from time to time (and any corresponding provisions of succeeding law).

~~1.1.21~~2.1.21 "Cumulative Net Return on Capital" means the Company's cumulative net income, after deductions for all operating, selling, general and administrative expenses, interest, taxes and extraordinary items expressed as a percentage of the aggregate capital contributions (in the form of cash or property or services, in

which case the fair market value of such property or services shall be deemed to be capital contributions) contributed to the Company by its Members at any time in exchange for Membership Interests.

~~1.1.22~~2.1.22 "Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

~~1.1.23~~2.1.23 "Disinterested Member" means a Member who is not related (within the meaning of Section 267(b) of the Code) to either the Member whose Membership Interest is to be transferred as provided in Article XII or the proposed Transferee of such Membership Interest.

~~1.1.24~~2.1.24 "Distributable Cash" means with respect to the Company at any time, all funds of the Company on hand or in bank accounts of the Company as, in the discretion of the Board, is then available for Distribution to the Members after provision has been made for (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for such reserves as the Board deems necessary or appropriate for Company operations.

~~1.1.25~~2.1.25 "Distribution" means any money or other Property distributed to a Member with respect to the Member's Membership Interest, but shall not include any payment to a Member for materials or services rendered nor any reimbursement to a Member for expenses permitted in accordance with this Agreement.

~~1.1.26~~2.1.26 "Encumbrance" means any lien, pledge, encumbrance, collateral assignment or hypothecation.

~~1.1.27~~2.1.27 "Facility" means the ambulatory surgical facility to be developed, owned and operated by the Company and located on the Site.

~~1.1.28~~2.1.28 "Fiscal Year" means an annual accounting period of each year during the term of the Company as specified by the Board.

~~1.1.29~~2.1.29 "Founders" means those Persons who or which are listed on Schedule I hereto as holders of Class II Units.

~~1.1.30~~2.1.30 "Gains from Capital Transactions" means the gains realized by the Company as a result of or upon any sale, exchange, condemnation or other disposition of capital assets of the Company or any entity in which the Company shall own an interest (which assets shall include Code Section 1231 assets and all real and personal property) or as a result of or upon damage to or destruction of such capital assets.

~~1.1.31~~2.1.31 "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Board, provided that, if the contributing Member and the Board cannot agree on the fair market value of a contributed asset, such determination shall be made by appraisal;

(ii) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times: (a) the acquisition of an additional interest in the Company (other than upon the initial formation of the Company) by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the Distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii) The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Board, provided that, if the distributee and the Board cannot agree on the determination of the fair market value of the distributed asset, such determination shall be made by appraisal; and

(iv) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and Sections 2.1.47(vi) and 10.11 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 2.1.31(iv) to the extent the Board determines that an adjustment pursuant to Section 2.1.31(ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 2.1.31(iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Sections 2.1.31(ii), 2.1.31(iii), or 2.1.31(iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits, Gains from Capital Transactions or Losses.

~~1.1.32~~2.1.32 "Liquidator" means the Board of Managers, or any Person appointed by the Board, which will supervise the liquidation of the Company following the occurrence of an event which pursuant to this Agreement shall cause its dissolution.

~~1.1.33~~2.1.33 "Majority in Interest" means a combination of any Members who, in the aggregate, own more than 50% of the Percentage Interests in the Company (irrespective of Classes).

~~1.1.34~~2.1.34 "Management Agent" means the Person who will manage the day-to-day business and affairs of the Facility.

~~1.1.35~~2.1.35 "Management Agreement" means the management agreement between the Company and ASC Management pursuant to which ASC Management or an Affiliate will manage the development and day-to-day operations of the Facility.

~~1.1.36~~2.1.36 "Member" means each Person designated as a Member of the Company, on Schedule I hereto, or any other Person admitted as a Member of the Company in accordance with this Agreement or the Act. "Members" refers to such Persons as a group.

~~1.1.37~~2.1.37 "Member Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i).

~~1.1.38~~2.1.38 "Member Nonrecourse Debt" has the same meaning as either "partner nonrecourse debt" or "partner nonrecourse liability" as defined in Treasury Regulations Section 1.704-2(b)(4), and means any nonrecourse debt (for the purposes of Treasury Regulations Section 1.1001-2) of the Company for which any Member bears the "economic risk of loss," within the meaning of Treasury Regulations Section 1.752-2.

~~1.1.39~~2.1.39 "Member Nonrecourse Deductions" has the same meaning as "partner nonrecourse deductions" as described in Treasury Regulations Section 1.704-2(i). The amount of Member Nonrecourse Deductions with respect to Member Nonrecourse Debt for any Fiscal year equals the excess, if any, of (a) the net increase, if any, in the amount of Member Minimum Gain attributable to such Member Nonrecourse Debt during Fiscal Year, over (b) the aggregate amount of any Distributions during that Fiscal Year to the Member that bears the economic risk of loss of such Member Nonrecourse Debt to the extent such Distributions are from the proceeds of such Member

Nonrecourse Debt and are allocable to an increase in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i).

~~1.1.40~~2.1.40 "Membership Interest" means all of a Member's rights in the Company, including without limitation, the Member's share of the Profits and Losses of the Company, the right to receive Distributions of the Company's assets (including such Member's Capital Account and all incidents thereto under this Agreement), any right to vote and any right to participate in the management of the Company as provided in the Act and this Agreement.

~~1.1.41~~2.1.41 "Minimum Gain" has the same meaning as "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(d).

~~1.1.42~~2.1.42 "Nonrecourse Deductions" means "nonrecourse deductions" as set forth in Treasury Regulations Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a given Fiscal Year equals the excess, if any, of (a) the net increase, if any, in the amount of Minimum Gain during such Fiscal Year, over (b) the aggregate amount of any Distributions during such Fiscal Year of proceeds of a Nonrecourse Liability that are allocable to an increase in Minimum Gain, determined according to the provisions of Treasury Regulations Section 1.704-2(h).

~~1.1.43~~2.1.43 "Nonrecourse Liability" has the same meaning as set forth in Treasury Regulations Section 1.704-2(b)(3), and means any Company liability (or portion thereof) for which no Member bears the "economic risk of loss," within the meaning of Treasury Regulations Section 1.752-2.

~~1.1.44~~2.1.44 "Obligation" shall mean only the obligation of the Company pursuant to its real property lease incurred with respect to the Facility.

~~1.1.45~~2.1.45 "Percentage Interest" means, with respect to each Member, the number of Units (regardless of the Class of such Units) owned by such Member divided by the total number of issued and outstanding Units (regardless of Class). The initial Percentage Interests of the Members are set forth on Schedule I.

~~1.1.46~~2.1.46 "Person" means an individual, a trust, an estate, a domestic corporation, a foreign corporation, a professional corporation, a partnership, a limited partnership, a limited liability company, a foreign limited liability company, an unincorporated association or other entity.

~~1.1.47~~2.1.47 "Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such year or period (excluding Gains from Capital Transactions), determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately

pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 2.1.47 (excluding Gains from Capital Transactions) shall be added to such taxable income or loss;

(ii) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-l(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section 2.1.47 shall be subtracted from such taxable income or loss;

(iii) In the event the Gross Asset Value of any Company asset is adjusted pursuant to Sections 2.1.31(ii) or 2.1.31(iii) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purpose of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with Section 2.1.22 hereof;

(vi) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-l(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

(vii) Notwithstanding any other provision of this Section 2.1.47, any items which are specially allocated pursuant to Sections 10.2, 10.3, 10.7, 10.8, 10.9, 10.10, 10.11 and 10.12 hereof shall not be taken into account in computing Profits and Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Sections 10.2, 10.3, 10.7, 10.8, 10.9, 10.10, 10.11 or 10.12 hereof shall be determined by applying rules analogous to those set forth in Sections 2.1.47(i) through 2.1.47(vi) above.

~~1.1.48~~2.1.48 "Property" means (i) any and all property acquired by the Company, real and/or personal (including, without limitation, intangible property), and (ii) any and all of the improvements constructed on any real property.

~~1.1.49~~2.1.49 "Purchase Option" means the option under Section 13.3 hereof to purchase a Withdrawing Member's Membership Interest following the occurrence of a Buy-Sell Event with respect to such Member.

~~1.1.50~~2.1.50 "Purchase Option Assignee" means the non-Member assignee of the Purchase Option to purchase a Withdrawing Member's Membership Interest as described within Section 13.4.

~~1.1.51~~2.1.51 "Purchasing Member" means those Members who elect to purchase a Withdrawing Member's Membership Interest following the Company's election not to exercise the Purchase Option.

~~1.1.52~~2.1.52 "Refinancing Proceeds" means (i) the cash realized from the financing or refinancing of all or any portion of the Property or other Company assets, less the retirement of any related mortgage loans and the payment of all expenses relating to the transaction and a reasonable reserve for future expenditures as provided by Section 15.2 and (ii) the Company's allocable portion of cash realized by an entity in which the Company owns an interest from such entity financing or refinancing all or any portion of such entity's assets, less the retirement of any related mortgage loans and the payment of all expenses relating to such transaction and a reasonable reserve for future expenditures as provided by Section 15.2.

~~1.1.53~~2.1.53 "Sales Proceeds" means (i) the cash realized from the sale, exchange, condemnation, casualty or other disposition of all or any portion of the Property or other Company assets, less the retirement of any related mortgage loans and the payment of all expenses relating to the transaction and a reasonable reserve for future expenditures as provided by Section 15.2 and (ii) the Company's allocable portion of cash realized by an entity in which the Company owns an interest from the sale, exchange, condemnation, casualty or other disposition of all or any portion of such entity's assets, less the retirement of any related mortgage loans and the payment of all expenses relating to such transaction and a reasonable reserve for future expenditures as provided by Section 15.2.

~~1.1.54~~2.1.54 "Secretary" means the Ohio Secretary of State.

~~1.1.55~~2.1.55 "Site" means the parcel of land in or near Sandusky, Ohio on which it is contemplated that the Facility will be constructed.

~~1.1.56~~2.1.56 "Transfer" means the sale, conveyance, hypothecation or transfer by any other means by Membership Interests in the Company. "Transferor" refers to the Member effecting the Transfer. "Transferee" means the Person to whom the Transfer is intended.

~~1.1.57~~2.1.57 "Transfer Notice" means the written notice certifying a Member's intent to Transfer his or her Membership Interest.

~~1.1.58~~2.1.58 "Treasury Regulations" means the regulations promulgated by the United States Department of the Treasury under the Code (or under any applicable successor thereto).

~~1.1.59~~2.1.59 "Unit(s)" means the increments of Membership Interest offered or authorized to be offered to investors in the Company's Private Placement Memorandum dated January 7, 1999, the increments of Membership Interest issued to Founders, and the increments of Membership Interest authorized for issuance under Sections 6.2 or 9.2 of this Agreement.

~~1.1.60~~2.1.60 "Withdrawing Member" means any Member with respect to whom a Buy-Sell Event has occurred.

## ARTICLE III - MANAGEMENT OF THE COMPANY

~~1.1~~3.1 **Board of Managers.** There shall be five (5) members of the Company's Board of Managers ("Board Members") who shall be elected or appointed as set forth in Section 4.5 herein, and, except as otherwise may be expressly provided in this Agreement, the Articles of Organization or the Act, all decisions with respect to the management of the business and affairs of the Company shall be made by action of the Board of Managers.

~~1.2~~3.2 **Management Agent.** The Company shall employ ASC Management as a Management Agent to oversee the development of the Facility as well as to conduct, supervise and direct the day-to-day operations of the Company under the supervision of the Company's Board of Managers pursuant to a Management Agreement as set forth in Section 4.12 herein.

~~1.3~~3.3 **Compensation and Expenses.** Board Members shall not receive any compensation from the Company for serving as such, but the Company will reimburse Board Members for expenses incurred in connection with their service to the Company. Nothing contained in this Section is intended to affect the Percentage Interest of a Board Member who is also a Member or the amounts that may be payable to such person by reason of his or her respective Percentage Interest.

~~1.4~~3.4 **Indemnification.** The Company shall indemnify Board Members and the Management Agent (and its managers, officers, members, employees and agents)to the fullest extent permitted or required by the Act against claims, causes of action, suits, fees or costs brought against, or incurred by, Board Members or the Management Agent by non-Members as a result of the performance of their respective duties, and the Company may advance expenses incurred by Board Members and the Management Agent (and its managers, officers, members, employees and agents) upon the approval of a Majority in Interest of the Members and the receipt by the Company of the signed statement of a Board Member or the Management Agent agreeing to reimburse the Company for such advance in the event it is ultimately determined that such Person is not entitled to be indemnified by the Company against such expenses. The provisions of this Section 3.4 shall apply also to any Person to whom the Board of Managers has delegated management authority as provided in Sections 6.1.1 or 8.1. The obligation of the Company to indemnify the Management Agent shall not extend to any claims, causes of action, suits, fees or costs brought against the Management Agent by the Company or as a result of a breach of the Management Agreement described in Section 4.12 of this Agreement.

~~1.5~~3.5 **No Liability for Return of Capital Contribution.** The Board Members and Management Agent shall not be liable for the return of the Capital Contributions of the Members, and upon dissolution, the Members shall look solely to the assets of the Company.

## ARTICLE IV - RIGHTS AND OBLIGATIONS OF MEMBERS

~~1.1~~4.1 **Eligibility Requirements of Members.** Except as otherwise provided within this Agreement, no Person shall be admitted as a Member unless such Person satisfies the eligibility requirements of one of the three classes described below:

(a) Class I Units. No Person shall be eligible to purchase Class I Units, other than an individual surgeon or physician specialist who is licensed to practice medicine in the Sandusky and Erie County, Ohio area or medical entity consisting of such surgeons or physicians specialists;

(b) Class II Units. No Person shall be entitled to purchase Class II Units other than Founders.

(c) Class III Units. No Person shall be entitled to purchase Class III Units other than ASC.

The foregoing limitations and qualifications concerning the respective Classes of Units shall not apply in connection with any purchase of Units by existing Members pursuant to rights granted under Section 13.3 and may be waived or amended in the discretion of the Board of Managers.

~~1.2~~4.2 **Limitation on Size of Holdings.** In order to obtain a broader membership base, thereby increasing the Company's operating efficiencies and increasing its ability to serve the Sandusky and Erie County, Ohio area through the provision of quality low cost health care

services to the greatest possible number of persons in such area, ASC shall not be entitled to acquire more than 15 Units of Membership Interest in the Company and no physician Member of the Company shall be entitled to acquire more than a combined total of five (5) Class I and II Units in the Company except as otherwise authorized by the affirmative vote of a majority of the Company's Board Members. Notwithstanding the foregoing, the five (5) Unit maximum will be applied to entities eligible for Class I and II membership, based upon the number of individual physicians holding beneficial ownership interests in such entities (i.e., if an entity consists of five (5) physician shareholders, such entity and/or its shareholders can collectively hold up to twenty-five (25) Units in the Company). In addition, in the event that a Buy/Sell Event, as described in Article XIII herein, should occur to a single constituent physician of an entity Member, the entity Member shall be afforded the opportunity, for a period of three hundred and sixty-five (365) days, to add an additional constituent physician, rather than lose a proportionate right to ownership previously represented by the affected physician. Further, the Board of Managers shall be free to modify or remove the foregoing limitations on the size of ownership as it deems appropriate in the event that it determines that the limitations are not serving their intended purpose or for any other reason.

~~1.3~~4.3 **Names and Addresses of Members.** The names, addresses, classes, and Percentage Interests of the Members are as reflected in Schedule I attached hereto and made a part hereof, which Schedule shall be amended as of the effectiveness of any transfer or subsequent issuance of any Percentage Interest.

~~1.4~~4.4 **No Management by Members.** The Members in their capacity as Members shall not take part in the management or control of the business, nor transact any business for the Company, nor shall they have power to sign for or to bind the Company.

~~1.5~~4.5 **Election of Managers.** Subject to Article VI below, the various entities and Classes of Members in the Company shall be entitled to designate or elect Board Members as follows:

(a) ASC. ASC shall be entitled to appoint one Person to the Board of Managers so long as ASC is a Member of the Company;

(b) Class I and II Members. Class I and II Members shall be entitled to collectively elect all remaining Board Members.

(c) Loss of Right to Designate Managers. The ability of ASC to appoint a member of the Board of Managers as set forth above shall prevail for only so long as it, or its Affiliate or successor, shall (i) have an ownership interest in the Company, or (ii) serve as the Management Agent. (The Board of Managers shall consist of five (5) Persons as set forth in Section 6.3 below.)

~~1.6~~4.6 **Action by Members.** Any action to be taken by the Members under the Act or this Agreement may be taken at a meeting of Members or upon written consent as provided in Article V.

~~1.7~~4.7 **Limited Liability.** The Members shall not be required to make any contribution to the capital of the Company except as otherwise provided in this Agreement, nor shall the Members in their capacity as Members or Board Members be bound by, or liable for, any expense, liability or obligation of the Company except to the extent of: (i) their Capital Contribution, (ii) their proportionate share of the undistributed profits of the Company, and (iii) the amount of certain Distributions received from the Company as provided by the Act and pursuant to their possible obligation to guaranty the Company's Obligation as set forth in Section 4.14 herein. The Members shall be under no obligation to restore a deficit Capital Account upon the dissolution of the Company or the liquidation of any of their Membership Interests.

~~1.8~~4.8 **Bankruptcy or Incapacity of a Member.** A Member shall cease to have any power as a Member or Board Member or any voting rights or rights of approval hereunder upon bankruptcy, insolvency, dissolution, assignment for the benefit of creditors, legal incompetency or the occurrence of any other Buy-Sell Event and the Member, its personal representative or successor upon the occurrence of any such event shall have only the rights, powers and privileges of a transferee enumerated in Article XII, and shall be liable for all obligations of the Member under this Agreement. In no event, however, shall a personal representative or successor become a substitute Member unless the requirements of Article XII are satisfied.

~~1.9~~4.9 **Restrictive Covenant Applicable to Members.** No Member, may, directly or indirectly or through one or more Affiliates invest in or possess a financial interest in (whether as owner security holder, creditor, consultant or otherwise) any ambulatory surgery center which offers services similar to those offered within the Facility and which operates within a twenty-five (25) mile radius from the Facility. The covenant of this Section 4.9 shall apply at all times that such Member holds any Membership Interest in the Company. Each Member by execution hereof agrees that the restraints imposed by this Section 4.9 are reasonable as to time, scope and geographic limitation, but if at the time of enforcement of any provision of this Section 4.9, a court of competent jurisdiction holds that the restrictions stated herein are unreasonable or unenforceable for any reason, the parties hereto agree that the maximum time period, scope or geographical area found to be reasonable under such circumstances will be substituted for the stated period, scope or area. The provisions of this Section 4.9 shall be null, void and unenforceable by the Company or any other entity upon the occurrence of a dissolution event as contemplated under Section 14.1 below (except that the death, bankruptcy or other event of dissolution with respect to a Member shall not render this Section null, void or unenforceable if the business of the Company is continued as provided therein). The obligations of Members established under this Section shall be enforceable both at law and in equity, by injunction, specific performance, damages or other remedy and without the necessity of posting any bond or other security; and the right of the Company to obtain any such remedy shall be cumulative and not alternative and shall not be exhausted by any one or more uses thereof. Notwithstanding any statement contained in this Section to the contrary, legal or beneficial ownership (i) by a Member which was acquired prior to the purchase of Membership Interests in the Company, or (ii) of a less than ten percent (10%) interest in a competitive corporation at least one class of capital stock of which is publicly traded on a national or regional stock exchange or by means of an electronic interdealer quotation system shall not be deemed to constitute a breach by the Member of the

terms hereof. In addition, services offered by a physician Member shall not be deemed to be in violation of this restrictive covenant.

~~1.10~~4.10 **Other Business Ventures and Activities; Conflicts of Interest.** Except as specifically prohibited in Section 4.9 above, each Member and that Member's Affiliates may engage, invest or possess an interest in other business ventures, investments, or transactions of any kind, nature or description, independently or with others, notwithstanding that such ventures, investments or transactions are directly or indirectly competitive with the Company. Except as specifically prohibited in Section 4.9 above, the fact that a Member or any Affiliate of such Member may take advantage of any such business opportunities, either alone or with other Persons, including organizations in which the Member or its Affiliates has an interest, and not offer such opportunities to the Company or to the other Members, shall not subject such Member or its Affiliates to liability to the Company or to the other Members on account of any lost opportunity. Except as specifically prohibited in Section 4.9 above, neither the Company nor any Member shall have any right by virtue of this Agreement, or the relationships created hereby, in or to such other ventures, investments, transactions or opportunities, or to the income or profits derived therefrom; and the pursuit of such other ventures, investments, transactions or opportunities, even though competitive with the business of the Company, shall not be deemed wrongful or improper or in violation of this Agreement or any rights of the Company or the Members under the Act or other applicable law. The Company shall not acquire property or services, lease property or enter into any business transaction with a Member or any Affiliate of a Member without such transaction first being approved by a majority of the members of the Board of Managers excluding any member of the Board of Managers who, by himself or herself or through an Affiliate, will provide such property or services or otherwise enter into the transaction with the Company. Except as otherwise specifically provided in this Agreement, each Manager must account to the Company and hold as trustee for it any profit or benefit derived by such Manager or his or her Affiliate without the informed consent of the Board of Managers including the Manager deriving such profit or benefit from any transaction connected with the formation, conduct or liquidation of the Company or from any personal use by such Manager of the Company's Property.

~~1.11~~4.11 **Percentage Interest of Class II Members or Founders.** Only Founders shall be entitled to purchase Class II Units. Upon issuance, a Class II Unit shall be equal in terms of Percentage Interest in the Company to any other single Unit of any other Class notwithstanding that the Capital Contributions of Class II Members are less than would be required to purchase a similar Percentage Interest through the acquisition of Class I or III Units. Such Percentage Interest shall entitle Class II Members to share in a corresponding percentage of the Company's Profits, Losses, credits, deductions, gain, Cash Flow, Refinancing Proceeds and Sales Proceeds and to enjoy the rights and privileges of a Member (but each such Member's Capital Account shall reflect only the amount of cash actually contributed to the Company, adjusted in accordance with Section 9.5).

~~1.12~~4.12 **Management Agreement.** Upon admission of the Members to the Company and the election of a Board of Managers, the Company shall enter into the Management Agreement with ASC Management pursuant to which ASC Management shall oversee the

development of the Facility as well as administer its day-to-day operations under the supervision of the Company's Board of Managers for an initial term of five (5) years. In return for the performance by ASC Management of the foregoing services, ASC Management shall receive fees as specified in the Management Agreement.

~~1.13~~4.13 **Payment of Fees and Costs.** Upon and after admission of the Members to the Company, the Company shall pay from the Capital Contributions made by the Members the operating costs of the Company and all organizational, developmental, licensing, certification and offering costs and expenses as well as interior design, fees and miscellaneous costs and expenses which have not been previously defrayed through the contributions of the Founders. These organizational and developmental costs and expenses shall include costs and expenses of the Company incurred by or on behalf of the Company in connection with the offering of the Units including out-of-pocket expenses of ASC relating to their efforts in connection with the development of the Facility, professional fees and expenses of ASC and its subcontractors and the Company's legal counsel in connection with the foregoing. No approval of the payment of such costs, fees and expenses by the Board of Managers shall be required or necessary. However, ASC shall present all costs in excess of projections and all organizational costs in excess of those included in the projected statement of cash flows to the Board of Managers for approval. Such approval shall not be unreasonably withheld as long as the costs are reasonable and customary.

~~1.14~~4.14 **Guaranty of Company Obligation.** To the extent that the Company, in the sole discretion of the Initial Manager or Board of Managers, can obtain an economically favorable real estate lease (the "Obligation"), Members will not be required to personally guarantee such obligation. If such lease is not readily available on economically acceptable terms absent the personal guarantees of the Company's Members, Members will be required to personally guarantee such lease. If required, such guarantees will be limited to: (a) the initial five (5) years of the lease, and (b) 100% of the Member's Percentage Interest in the Company on an individual, and not joint and several, pro-rata basis. If a Membership Interest is owned by an entity consisting of physicians, all of whom perform Procedures within the Facility, the appropriate guaranty shall be rendered by the Member entity if permitted by the Company's creditors. Should the Company's creditors decline to accept a guaranty from a Member entity, each of the entity's constituent members may be required to personally guaranty a pro rata portion of the Member entity's guaranty obligation. When entering into an Obligation on behalf of the Company, the Board of Managers shall exercise care to ensure that the forms of such guarantees are as fair as possible under the circumstances to Members rendering such guarantees.

## ARTICLE V - MEETINGS OF MEMBERS

~~1.1~~5.1 **Annual Meeting.** The Members shall meet no less than annually, with such annual meeting to be held at 7:00 p.m. on March 2nd of each year, if not a Saturday, Sunday or legal holiday, but if a Saturday, Sunday or legal holiday, then on the next business day which is not a Saturday, Sunday or legal holiday, for the purpose of electing the Board of Managers and the transaction of such other business as may be properly brought before the meeting. As soon as practicable after admission of the Members, a special meeting of the Members shall be held for the purpose of electing the Board of Managers.

~~1.2~~5.2 **Place of Meetings.** Meetings of Members shall be held at the principal office of the Company or at such other place, either within or without the State of Ohio, as shall be designated in the notice of the meeting.

~~1.3~~5.3 **Substitute Annual Meeting.** If the annual meeting is not held on the day designated by this Agreement a substitute annual meeting may be called in accordance with Section 5.4. A meeting so called shall be designated and treated for all purposes as the annual meeting.

~~1.4~~5.4 **Special Meetings.** Special meetings of the Members shall be called at any time by the Chairman of the Board of Managers, any two members of the Board of Managers or by not less than one-tenth of all the Members entitled to vote at the meeting upon their execution and delivery to the secretary of the Board of Managers one or more written demands for the meeting, in each case describing the purpose or purposes for which it is to be held.

~~1.5~~5.5 **Notice of Meetings.** At least ten (10) and no more than fifty (50) days prior to any annual or special meeting of Members, the Company shall notify Members of the date, time and place of the meeting and, in the case of a special or substitute annual meeting, shall briefly describe the purpose or purposes of the meeting. Only business within the purpose or purposes described in the notice may be conducted at a special meeting. If an annual or special meeting is adjourned to a different date, time or place, notice thereof need not be given if the new date, time or place is announced at the meeting before adjournment. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each member entitled to vote at the meeting. It shall be the primary responsibility of the secretary to give the notice, but notice may be given by or at the direction of the Chairman of the Board of Managers or other person or persons calling the meeting. If mailed, such notice shall be deemed to be effective when deposited in the United States mail with postage prepaid, correctly addressed to the Members' addresses shown in the Company's current record of Members.

~~1.6~~5.6 **Quorum.** Members owning a Majority in Interest of the Percentage Interests and represented in person or by proxy at a meeting of Members shall constitute a quorum. Once the Percentage Interests of a Member are represented for any purpose at a meeting, such Percentage Interests are deemed present for quorum purposes for the remainder of the meeting and any adjournment thereof, unless a new record date is or must be set for the adjournment. In the absence of a quorum at the opening of any meeting of Members, such meeting may be

adjourned from time to time by a vote of Members holding a majority of the Percentage Interests represented at the meeting to adjourn.

~~1.7~~5.7 **Members' List.** After a record date is fixed for a meeting, the secretary of the Board of Managers shall prepare an alphabetical list of the names of all Members who are entitled to notice of the Members' meeting. Such list shall show the address and Percentage Interests of each Member. The Members' list shall be made available for inspection by any Member beginning two (2) business days after notice of the meeting is given for which the list was prepared and continuing through the meeting, at the Company's principal office. The Company shall make the Members' list available at the meeting, and any Member or its agent or attorney is entitled to inspect the list at any time during the meeting or any adjournment. Action by the Members of any Class or Classes shall be made by a majority vote of the Members of such Class or Classes with each Member of such Class or Classes entitled to one vote per each percentage point of Percentage Interest owned by such Member.

~~1.8~~5.8 **Voting of Members.** Except with respect to actions for which a greater vote or approval is otherwise specifically required elsewhere in this Agreement or the Act, action by the Members or a Class or Classes of Members shall be made by action of a Majority in Interest of the Members represented at the meeting or a Majority in Interest of the affected Class if voting by separate Classes is provided for herein. Voting on all matters shall be by voice vote or by a show of hands, unless the holders of one-tenth of the Percentage Interests represented at the meeting shall demand a ballot vote on a particular matter. Each Member shall be entitled to one vote per each Unit owned by such Member. Votes of Members holding fractional Units shall be rounded to the one-quarter Unit.

~~1.9~~5.9 **Action Without Meeting.** Any action which the Members could take at a meeting may be taken without a meeting if one or more written consents, setting forth the action taken, shall be signed, before or after such action, by Members holding in the aggregate Percentage Interests at least equal to the vote required to approve the action and who would be entitled to vote upon the action at a meeting. The consent shall be delivered to the Company for inclusion in the minutes for filing with the Company's records. Any action approved by written consent shall be deemed effective following the issuance of written notice to the Members of the Company who or which have not signed the consent.

## ARTICLE VI - BOARD OF MANAGERS

~~1.1~~6.1 **General Powers.**

~~1.1.1~~6.1.1 The Members hereby delegate management of the business and affairs of the Company to the discretion of the Board of Managers, except as otherwise provided in this Agreement or the Act. The Board may, in its sole discretion, delegate any authority delegated to it pursuant to this Agreement to any officer or agent. The Board of Managers shall have full and complete authority, power and discretion to manage and control the business of the Company, to make all decisions regarding those

matters and to perform any and all other acts customary or incident to the management of the Company's business, except only those acts as to which approval by the Members is expressly required by the Articles of Organization, this Agreement, the Act or other applicable law. Specifically, without limiting the foregoing, the Board of Managers shall have the authority to: (i) establish reserves to cover operating deficits, expansion of the Facility and other future needs of the Company; (ii) cause the Company to borrow funds for the needs of the Company; (iii) select the Site and cause the Company to lease the Site in accordance with the terms of this Agreement and (iv) cause the Company to enter into appropriate agreements for the construction and equipping of the Facility. The Board of Managers shall delegate responsibility for the day-to-day management of the Company to the Management Agent who shall have and exercise on behalf of the Company all powers and rights necessary or convenient to carry out such management responsibilities. The Management Agent shall have experience as a manager of an ambulatory surgical facility, shall supervise employees of the Company and shall have the exclusive authority to hire and terminate employees of the Company in accordance with policies approved by the Board of Managers. The Company shall enter into a Management Agreement with the Management Agent as provided elsewhere herein.

~~1.1.2~~6.1.2 Each Board Member serving on the Board of Managers shall serve in such capacity until the earlier to occur of (i) such person's resignation; (ii) such person's death; (iii) such person's removal in accordance with Section 6.4; or (iv) the expiration of such person's term on the Board of Managers and the election or appointment of his or her successor.

~~1.1.3~~6.1.3 In the event federal, state or local laws, rules, regulations or case law are passed or decided or come into being which restrict or prohibit ownership of Membership Interests by health care providers, the Board of Managers shall have the authority to bring the Company and Facility into compliance with such laws, rules or regulations by (i) causing the Company to purchase any or all of the Membership Interests of any Member to the extent necessary to cause the Company and Facility to comply with such laws, rules or regulations, (ii) causing the sale of any or all of the Membership Interests of any Member to the extent necessary to cause the Company and Facility to comply with such laws, rules or regulations, (iii) dissolving and liquidating the Company in accordance with the terms of this Agreement, or (iv) amending the terms of this Agreement and/or the Company's Articles of Organization if counsel for the Company shall deem it advisable in order to comply with all applicable laws.

~~1.1.4~~6.1.4 Each Member hereby irrevocably makes, constitutes and appoints the Chairman of the Board of Managers, whomever he or she may be at any given point in time, with full power of substitution, as such Member's true and lawful attorney-in-fact, for him or her and in his or her name, place and stead for his or her use and benefit to sign, acknowledge, swear to, deliver and file any document necessary to conduct the Company's business as approved by the Board of Managers, such as, but not limited to, the deeds of conveyance of real or personal property, bills of sale, deeds of trust, loan documents, any amendment to this Agreement and the Company's Articles of

Organization, any certificates of assumed or fictitious name, the qualification of the Company in a foreign jurisdiction (or amendment to such qualification), the admission or substitution of Members or the dissolution or termination of the Company (including the decision to continue the business of the Company upon the occurrence of any event of dissolution) and to perform any other duty or function necessary for the conduct of the business or purposes of the Company to which this Agreement relates.

The foregoing power of attorney is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death or legal incapacity of the Member. It may be exercised by any one of said attorneys by listing all of the Members executing any instrument subject to the power of attorney over the signature of the attorney-in-fact for all of them. This power of attorney will survive any permitted assignment by a Member of the whole or any portion of his or her Membership Interest. In the event a permitted assignee of, or the successor to, a Member owning a Membership Interest has been approved by the Company for admission to the Company as a substitute Member, the power of attorney shall survive for the sole purpose of enabling the attorney-in-fact to execute, acknowledge and file any instrument necessary to effect such substitution. This power of attorney shall not be affected by the Member's subsequent incapacity or mental incompetence.

~~1.2~~6.2 **Limitations on Power and Authority of Board of Managers.** Without the consent of the Members holding more than 67% of the Percentage Interests, the Board of Managers or any Board Member thereof shall have no authority to do any of the following:

(a) Sell all or substantially all of the assets of the Company;

(b) Change the business of the Company, including the material modification of any material contract of the Company (i.e., the Management Agreement);

(c) Engage in transactions that could result in the termination or reorganization of the Company or a partial or total dissolution of all Members' interests in the Company;

(d) Merge or consolidate with another entity;

(e) Sell additional interests in the Company except as set forth below (provided the existing Members will first be offered the opportunity, pro rata in accordance with their relative Percentage Interests in the Company, to purchase such additional interests, except in connection with the issuance of replacement Units in accordance with Section 13.9, which the Board of Managers may do without further authorization of the Members); or

(f) Purchase assets not related to the business of the Company.

Notwithstanding this Section 6.2, the consent of the Members shall not be required for the Board of Managers to sell ten (10) Class I Units which will not be offered for sale with the Company's initial private placement which Units may be sold as Class I Units. Such Units, are hereby reserved for sale by the Board of Managers to eligible Investors who meet the applicable Class qualifications at the fair market value of such Units as determined by the Board in its sole discretion at the time of issuance and the Members shall not be offered the first opportunity, pro rata in accordance with their relative Percentage Interests in the Company, to purchase such additional Units when issued

~~1.3~~6.3 **Number, Term and Qualification.** The Board of Managers shall consist of five (5) Persons. Each member of the Board of Managers shall be elected or appointed as set forth in Section 4.5. Voting for Board Members (excluding the designee of ASC) shall be by the vote of the Class I and Class II Members, with the four (4) persons receiving the greatest number of votes from Class I or Class II Members at any meeting of the Members being elected to such Board seats. Board Members need not be either physicians or Members of the Company, however, if they are natural persons, they must be at least eighteen (18) years of age. The terms of the four (4) Board Members elected by the Class I or Class II Members shall be as follows: (a) two (2) of such Board Members shall be elected for initial terms of one (1) year each with their successors to be elected for two (2) year terms; and (b) two (2) of such Board Members shall be elected for initial terms of two (2) years each with their successors also serving two (2) year terms. A Manager (excluding the Designee of ASC) may serve a maximum of three (3) consecutive terms as a Manager. Thereafter, the Manager who has served three (3) consecutive terms as a Manager shall not be eligible to again serve in the position of a Manager until after a period of one (1) year following the expiration of such Manager's term.

~~1.4~~6.4 **Removal.** Members of the Board of Managers may be removed from office by vote or written consent of a majority of the Percentage Interests of Members holding the Class or Classes of Units which elected or appointed such Board Member provided the notice of the Members' meeting at which such action is to be taken state that a purpose of the meeting is the removal of such member of the Board.

~~1.5~~6.5 **Vacancies.** A vacancy occurring on the Board of Managers shall be filled by the same method in which the position had been last filled prior to its vacancy, as set forth in Section 4.5 of this Article; provided, however, that upon notice to the appropriate Member or Members, if such Member or Members fail to fill the vacancy, the Board of Managers may elect a Person to fill such vacancy. In any case, a Person elected to fill a vacancy on the Board of Managers shall be elected for the unexpired term of his or her predecessor in office.

## ARTICLE VII - MEETINGS OF BOARD OF MANAGERS

~~1.1~~7.1 **Annual and Regular Meetings.** The annual meeting of the Board of Managers shall be held immediately following the annual meeting of the Members. The Board of Managers may by resolution provide for the holding of regular meetings of the Board on specified dates and at specified times. Immediately following the first special meeting of the Members, the Board of

Managers shall meet to elect a Chairman, Vice Chairman and Secretary/Treasurer of the Board in accordance with Article VIII below, and transact any other business of the Company.

~~1.2~~7.2 **Special Meetings.** Special meetings of the Board of Managers may be called by, or at the request of, the Chairman of the Board of Managers or by any two (2) members of the Board of Managers. Such meetings may be held at the time designated in the notice of the meeting within the principal offices of the Company unless a majority of the Board determines otherwise.

~~1.3~~7.3 **Notice of Meetings.** The annual and regular meetings of the Board of Managers held at the principal office of the Company and at the usual scheduled time may be held without notice of the date, time, place or purpose of the meeting. The Person or Persons calling a special meeting shall give notice by any usual means of communication to be sent at least five (5) days before the meeting if sent by means of telephone, telecopy or personal delivery and at least ten (10) days before the meeting if notice is sent by mail. A Board Member's attendance at, or participation in, a meeting for which notice is required shall constitute a waiver of notice, unless the Member at the beginning of the meeting (or promptly upon arrival) objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

~~1.4~~7.4 **Quorum.** A majority of the Board Members in office shall constitute a quorum for the transaction of business at a meeting of the Board of Managers.

~~1.5~~7.5 **Manner of Acting.** The affirmative vote of a majority of the Board Members present at a meeting at which a quorum is present shall be the act of the Board of Managers.

~~1.6~~7.6 **Presumption of Assent.** A Board Member who is present at a meeting of the Board of Managers at which action on any matter is taken is deemed to have assented to the action taken unless he or she objects at the beginning of the meeting (or promptly upon arrival) to holding, or transacting business at, the meeting, or unless his or her dissent or abstention is entered in the minutes of the meeting or unless he or she shall file written notice of this dissent or abstention to such action with the presiding officer of the meeting before its adjournment or with the Company immediately after adjournment of the meeting. The right of dissent or abstention shall not apply to a Board Member who voted in favor of such action.

~~1.7~~7.7 **Action Without Meeting.** Action required or permitted to be taken at a meeting of the Board of Managers may be taken without a meeting if the action so taken is signed by all of the members of the Board of Managers. The action must be in writing, but may be signed in one or more written counterparts describing the action taken. The action shall be included in the minutes or filed with the Company's records. Any action taken without a meeting is effective when the last Board Member signs the consent, unless the consent specifies a different effective date.

~~1.8~~7.8 **Meeting by Communications Device.** The Board of Managers may permit any or all of its members to participate in a regular or special meeting by, or conduct the meeting

through the use of, any means of communication by which all Board Members participating in a meeting can hear each other during the meeting. Any Member participating in a meeting by such means shall be deemed to be present in person at the meeting for all purposes.

## ARTICLE VIII - MANAGERS AND OFFICERS OF THE BOARD OF MANAGERS

~~1.1~~8.1 **Titles.** The officers of the Board of Managers shall be a Chairman, a Vice Chairman and a Secretary/Treasurer and may include one or more assistant secretaries and such other officers as shall be deemed necessary by the Board of Managers. The officers shall be Board Members and shall have the authority and perform the duties as set forth herein or as from time to time may be prescribed by the Board of Managers. The Chairman and Vice Chairman shall be elected from Class I and II Board Members and, so long as ASC is a Member and holder of Class III Units, ASC's Board Member shall be appointed and serve as Secretary/Treasurer. Any two or more offices may be held by the same individual, but no officer may act in more than one capacity where action of two or more officers is required.

~~1.2~~8.2 **Election.** Except as otherwise provided in this Article VIII, each officer appointed by the Board of Managers shall serve in such capacity until the earlier to occur of the expiration of his or her term of office, or his or her removal, resignation or death and shall be elected annually by the Board of Managers.

~~1.3~~8.3 **Removal.** Any officer may be removed by the Board of Managers at any time with or without cause whenever, by action of a majority of the Board Members, but removal shall not itself affect the officer's contract rights, if any, with the Company.

~~1.4~~8.4 **Vacancies.** Vacancies among the officers may be filled and new offices may be created and filled by the Board.

~~1.5~~8.5 **Compensation.** Unless otherwise specifically determined by the Board of Managers, Persons serving as officers shall not be compensated; however, the Company shall reimburse officers for their expenses reasonably incurred in connection with fulfilling their duties.

~~1.6~~8.6 **Chairman.** The Chairman shall be in general charge of the affairs of the Board of Managers and the Company in the ordinary course of its business and shall preside at meetings of the Board of Managers and Members. The Chairman shall also:

(a) See that all orders and resolutions of the Board of Managers or Members are carried into effect;

(b) Sign and deliver in the name of the Company any deeds, mortgages, bonds, contractors or other instruments pertaining to the business of the Company except in cases in which the authority to sign and deliver is required by law to be exercised by

another person or is expressly delegated by the Articles of Organization or this Agreement or by the Board of Managers;

(c) Perform other duties prescribed by the Board of Managers or the Members; and

(d) In the event that the Company has a vacancy in the office of Secretary, any notices, documents or other matters that otherwise are required to go to the Secretary may be delivered to the Chairman.

The Chairman may perform such acts not inconsistent with the Act or this Agreement. The Chairman shall have such other powers and perform such other duties as the Board of Managers shall designate within limitations imposed by the Act or elsewhere in this Agreement.

~~1.7~~8.7 **Vice Chairman.** The Vice Chairman, if such officer is elected or appointed, shall exercise the powers of the Chairman in his or her absence or inability to act. Any action taken by a Vice Chairman in the performance of the duties of the Chairman shall be presumptive evidence of the absence or inability to act of the Chairman at the time the action was taken. The Vice Chairman shall have such other powers and perform such other duties as may be assigned by the Board of Managers.

~~1.8~~8.8 **Secretary/Treasurer.** The Secretary/Treasurer shall keep accurate records of the acts and proceedings of all meetings of the Members and of the Board of Managers and shall give all notices required by the Act and by this Agreement. The Secretary/Treasurer shall also:

(a) Keep accurate membership records for the Company;

(b) Maintain records of and, whenever necessary, certify all proceedings of the Board of Managers, Members or committees of the Company;

(c) Receive notices required to be sent to the Secretary and to keep a record of such notices in the records of the Company; and

(d) Perform other duties prescribed by the Board of Managers, the Members or the Chairman.

The Secretary/Treasurer shall have general charge of the books and records of the Company and shall have the responsibility and authority to maintain and authenticate such books and records. The Secretary/Treasurer shall keep at the principal office of the Company a current record of Members, showing the name, address and Membership Interest and Percentage Interest of each Member. The Secretary/Treasurer shall sign such instruments as may require the signature of the Secretary/Treasurer, and in general shall perform the duties incident to the office of Secretary/Treasurer and such other duties as may be assigned from time to time by the Board of Managers or the Chairman. So long as ASC is a Member of the Company, ASC's Board Member shall serve as the Secretary/Treasurer of the Company and shall have the right to

appoint, without further action of the Board, the Chief Financial Officer of ASC as an Assistant Secretary/Treasurer with all powers of the Secretary/Treasurer. Upon the termination of the Secretary/Treasurer's status as an officer of the Company, he or she shall deliver to the Board all of the books and records of the Company in his or her possession.

~~1.9~~8.9 **Assistant Secretary/Treasurer.** Each Assistant Secretary/Treasurer, if such officer is elected or appointed, shall have such powers and perform such duties as may be assigned by the Board of Managers or the Secretary/Treasurer, and the Assistant Secretary/Treasurer shall exercise the powers of the Secretary/Treasurer during that officer's absence or inability to act.

## ARTICLE IX - CAPITAL CONTRIBUTIONS AND LOANS

~~1.1~~9.1 **Initial Capital Contributions.** Contemporaneously with the execution of the Agreement, the Members have contributed cash to the Company in the amounts set forth as the initial Capital Contribution opposite their names on Schedule I hereto.

~~1.2~~9.2 **Additional Funds.** In the event that the Board of Managers determines at any time (or from time to time) that additional funds are required by the Company for or in respect of its business or to pay any of its obligations, expenses, costs, liabilities or expenditures (including without limitation any operating deficits), then the Board may in its discretion: (i) call a special meeting of the Members for the purpose of recommending to the Members that the Members make additional contributions to the capital of the Company, (ii) authorize and direct the proper officers of the Board of Managers to borrow all or part of such additional funds on behalf of the Company, with interest payable at then-prevailing rates, from one or more of the Members or from other commercial banks, savings and loan associations or other commercial lending institutions; or (iii) subject to Section 6.2, authorize and direct the proper officers of the Board of Managers to sell additional Units at their then "fair market value" as reasonably determined by the Board. .

~~1.3~~9.3 **Additional Capital Contributions.** If the Members elect to make additional Capital Contributions to the Company for the purpose of providing all or a portion of the additional funds required for the purposes set forth in Section 9.2 above, the Members shall make the necessary additional Capital Contributions to the Company in proportion to their respective Percentage Interests. Notwithstanding the foregoing, no Member shall be required under any circumstances to make additional Capital Contributions to the Company, and the failure of a Member to make an additional Capital Contribution agreed to by the Members pursuant to this Section 9.3 shall result only in the dilution of the non-contributing Member's Percentage Interest.

~~1.4~~9.4 **No Interest on Capital Contributions.** No interest shall be paid on any contribution to the capital of the Company.

~~1.5~~9.5 **Capital Accounts.** A Capital Account shall be established for each Member and shall be credited with each Member's initial and any additional Capital Contributions. All

contributions of Property to the Company by a Member shall be valued and credited to the Member's Capital Account at such Property's Gross Asset Value on the date of contribution. All distributions of Property to a Member by the Company shall be valued and debited against such Member's Capital Account at such Property's Gross Asset Value on the date of distribution. Each Member's Capital Account shall at all times be determined and maintained pursuant to the principles of this Section 9.5 and Treasury Regulations Section 1.704-l(b)(2)(iv). Each Member's Capital Account shall be increased in accordance with such Regulations by:

(a) The amount of Profits allocated to the Member pursuant to this Agreement;

(b) The amount of all Gains From Capital Transactions allocated to the Member pursuant to this Agreement; and

(c) The amount of any Company liabilities assumed by the Member or which are secured by any Company Property distributed to such Member.

Each Member's Capital Account shall be decreased in accordance with such Regulations by:

(a) The amount of Losses allocated to the Member pursuant to this Agreement;

(b) The amount of Cash Flow distributed to the Member pursuant to this Agreement;

(c) The amount of Sales Proceeds and Refinancing Proceeds distributed to the Member pursuant to this Agreement; and

(d) The amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

In addition, each Member's Capital Account shall be subject to such other adjustments as may be required in order to comply with the capital account maintenance requirements of Section 704(b) of the Code.

In the event that the Board of Managers shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including without limitation debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or the Members), are computed in order to comply with such Treasury Regulations, the Board may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member upon dissolution of the Company. The Board also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance

with Treasury Regulations Sections 1.704-l(b)(2)(iv)(g) and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-l(b).

## ARTICLE X - ALLOCATIONS, ELECTION AND REPORTS

~~1.1~~10.1 **Profits and Losses.**

(a) Except as otherwise provided in this Article X, Profits and Losses of the Company and all items of tax credit and tax preference shall be allocated among the Members in accordance with their respective Percentage Interests. In the event the Percentage Interests vary during any Fiscal Year, Profits and Losses and all items of tax credit and tax preference for such Fiscal Year shall be allocated among the Members on a daily basis in accordance with their varying Percentage Interests during the Fiscal Year.

(b) Losses allocated pursuant to this Section 10.1 shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to this Section 10.1, the limitation set forth in this Section 10.1 shall be applied on a Member by Member basis so as to allocate the maximum possible Losses to each Member under Treasury Regulations Section 1.704-l(b)(2)(ii)(d).

~~1.2~~10.2 **Nonrecourse Deductions.** Nonrecourse Deductions shall be allocated among the Members in accordance with their respective Percentage Interests.

~~1.3~~10.3 **Member Nonrecourse Deductions.** Any Member Nonrecourse Deductions shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

~~1.4~~10.4 **Allocations Between Transferor and Transferee.** In the event of the Transfer of all or any part of a Member's Membership Interest (in accordance with the provisions of this Agreement) at any item other than at the end of a Fiscal Year, or the admission of a new Member (in accordance with the terms of this Agreement), the Transferor or new Member's share of the Company's income, gain, loss, deductions and credits, as computed both for accounting purposes and for federal income tax purposes, shall be allocated between the Transferor and the Transferee, or the new Member and the other Members' as the case may be, in the same ratio as the number of days in such Fiscal Year before and after the date of the transfer or admission; provided, however, that if there has been a sale or other disposition of the assets of the Company (or any part thereof) during such Fiscal Year, then upon the mutual agreement of all the Members (excluding the new Member and the transferring Member), the Company shall treat the periods before and after the date of the transfer or admission as separate Fiscal Years and allocate

the Company's net income, gain, net loss, deductions and credits for each of such deemed separate Fiscal Years. Notwithstanding the foregoing, the Company's "allocable cash basis items," as that term is used in Section 706(d)(2)(B) of the Code, shall be allocated as required by Section 706(d)(2) of the Code and the Treasury Regulations thereunder.

~~1.5~~10.5 **Gains from Capital Transactions.** Gains from Capital Transactions during any Fiscal Year shall be allocated as follows:

(a) First, to those Members whose Capital Accounts immediately prior to the Capital Transaction were negative, in an amount sufficient to increase such Capital Accounts to zero, but in the event sufficient gain is not recognized to do so, then among them pro rata in proportion to their negative Capital Accounts;

(b) Second, to the Members in an amount equal to the difference between the Sales Proceeds to be distributed to each of the Members as provided in Section 11.2 and the Capital Accounts of each Member as adjusted (if necessary) by paragraph (a) above, but in the event sufficient gain is not recognized to do so, then among the Members in an amount which, when credited to the Capital Accounts of the Members, results in the Members' Capital Accounts bearing the same ratio to one another as the ratio of the distribution of Sales Proceeds to each of the Members, as provided in Section 11.2; and thereafter

(c) Any remaining gain shall be allocated among the Members in accordance with their respective Percentage Interests as of the date of the Capital Transaction giving rise to the gain.

~~1.6~~10.6 **Contributed Property.** In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and its initial Gross Asset Value at the time of contribution.

In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 2.1.31(iv) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Board of Managers in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 10.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, or other items or distributions pursuant to any provision of this Agreement.

~~1.7~~10.7 **Minimum Gain Chargeback.** If there is a net decrease in Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Minimum Gain, determined in accordance with Treasury Regulation Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f) and 1.704-2(j)(2). This Section 10.7 is intended to comply with the minimum gain chargeback requirement in Treasury Regulation 1.704-2(f) and shall be interpreted consistently therewith.

~~1.8~~10.8 **Member Minimum Gain Chargeback.** If there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt, as defined in Treasury Regulations Section 1.704-2(i)(4), during any Fiscal Year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and (5). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 10.8 is intended to comply with the Member Minimum Gain chargeback requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

~~1.9~~10.9 **Qualified Income Offset.** If any Member unexpectedly receives an adjustment, allocation or distribution as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4) through (6) which causes or increases a deficit Capital Account balance in such Member's Capital Account (as determined in accordance with such Regulations), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 10.9 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article X have been tentatively made as if this Section 10.9 were not in the Agreement. This provision is intended to be a "qualified income offset," as defined in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), such Regulations being specifically incorporated herein by reference.

~~1.10~~10.10 **Gross Income Allocation.** In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore, if any, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company

income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 10.10 shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article X have been tentatively made as if this Section 10.10 and Section 10.9 hereof were not in the Agreement.

~~1.11~~10.11 **Section 754 Adjustment.** To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-l(b)(2)(iv)(m)(2) or Treasury Regulation Section 1.704-l(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a Transfer by a Member of all or part of his, her or its Membership Interest or a Distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event that Treasury Regulations Section 1.704-l(b)(2)(iv)(m)(2) applies or to the Member to whom such distribution was made in the event that Treasury Regulations Section 1.704-l(b)(2)(iv)(m)(4) applies.

~~1.12~~10.12 **Curative Allocations.** The allocations set forth in Sections 10.1(b), 10.2, 10.3, 10.7, 10.8, 10.9, 10.10 and 10.11 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 10.12. Therefore, notwithstanding any other provision of this Section 10.12 (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 10.1(a). In exercising their discretion under this Section 10.12, the Board shall take into account future Regulatory Allocations under Sections 10.7 and 10.8, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 10.2 and 10.3.

~~1.13~~10.13 **Compliance with Treasury Regulations.** The above provisions of this Article X notwithstanding, it is specifically understood that the Board of Managers may make such elections, tax allocations and adjustments including amendments to this Agreement, as the Board deems necessary or appropriate to maintain to the greatest extent possible the validity of the tax allocations set forth in this Agreement, particularly with regard to Treasury Regulations under Code Section 704(b).

~~1.14~~10.14 **Tax Withholding.** The Company shall be authorized to pay, on behalf of any Member, any amounts to any federal, state or local taxing authority, as may be necessary for the Company to comply with tax withholding provisions of the Code or the applicable Ohio statutes

or other income tax or revenue laws of any taxing authority. To the extent the Company pays any such amounts that it may be required to pay on behalf of a Member, such amounts shall be treated as a cash Distribution to such Member and shall reduce the amount otherwise distributable to such Member.

## ARTICLE XI - DISTRIBUTIONS

~~1.1~~11.1 **Cash Flow.** The Cash Flow for each Fiscal year, to the extent available as determined by the Board of Managers, shall be distributed to the Members within thirty (30) days after the end of each fiscal quarter of the Company, or earlier in the discretion of the Board of Managers, in accordance with the Members' respective Percentage Interests; provided, however, that the Board of Managers shall be authorized to retain and not distribute any amount which the Board in its sole discretion deems reasonable to cover extraordinary expenses of the Company, including a minimum amount of $100,000.

~~1.2~~11.2 **Refinancing Proceeds and Sales Proceeds.** Refinancing Proceeds and Sales Proceeds, to the extent available, may be distributed to the Members within thirty (30) days of the Capital Transaction giving rise to such proceeds, or earlier in the discretion of the Board of Managers, in accordance with the Members' respective Percentage Interests.

~~1.3~~11.3 **Distributions in Liquidation.** Upon liquidation of the Company, all of the Company's property shall be sold as provided in Section 14.2 and Profits and Losses allocated accordingly. Proceeds from the liquidation of the Company shall be distributed in accordance with the provisions of Section 14.2.

~~1.4~~11.4 **Limitation Upon Distributions.** No Distribution shall be declared and paid if payment of such Distribution would cause the Company to violate any limitation on distributions provided in the Act.

## ARTICLE XII - TRANSFER OF INTERESTS AND ADMISSION OF MEMBERS

~~1.1~~12.1 **Restrictions on Transfer**. Except as provided herein:

(a) No Member may voluntarily or involuntarily Transfer, or create or suffer to exist any Encumbrance against, all or any part of such Member's record or beneficial interest in the Company; and

(b) No Person may be admitted to the Company as a Member except in accordance with Section 12.3 below. Except for withdrawals in connection with a Transfer of a Membership Interest permitted by this Agreement, no Member may withdraw from the Company without the consent of the Board of Managers.

(c) Notwithstanding the provisions of 12.1(a), a physician Member may transfer his or her interest to an Affiliated entity solely for estate planning purposes or any Member may transfer his, her or its Membership Interest to a wholly-owned entity for any reasonable purpose.

~~1.2~~12.2 **Conditions Precedent to Transfers.** Any purported Transfer or Encumbrance will be ineffective until the Transferor and his or her Transferee furnish to the Company the instruments and assurances the Board of Managers may request, including without limitation, if requested, an opinion of counsel satisfactory to the Company that the interest in the Company being Transferred or Encumbered has been registered or is exempt from registration under the Securities Act, and applicable state securities laws. No Transfer or Encumbrance will be effective if it would result in the "termination" of the Company under Section 708 of the Code unless all of the Members give their prior written consent to the Transfer or Encumbrance. Further, the terms of the option to purchase set forth in Article XIII shall be complied with before any Transfer is effective.

~~1.3~~12.3 **Substituted Members.** No assignee or Transferee of a Membership Interest shall be admitted as a substituted Member of the Company unless, in addition to compliance with the conditions set forth in Sections 12.1 and 12.2, all of the following conditions are satisfied:

(a) The assignee has executed and delivered all documents deemed appropriate by the Board of Managers to reflect the assignee's admission to the Company and its agreement to be bound by this Agreement;

(b) A majority of the non-transferring members of the Board of Managers shall have consented in writing to such substitution, the granting or denial of which shall be in the sole discretion of the Board Members;

(c) If requested by the Board of Managers, payment has been made to the Company of all costs and expenses of admitting any such Transferee or assignee as a substituted Member; and

(d) With respect to transfers of Class I or III Units, the assignee meets the applicable class qualification requirements as set forth herein, and with respect to transfers of Class II Units, the assignee meets the qualification requirements of Class I Investors.

(e) Upon receiving an offer to purchase his/her or its Membership Interest, the Member desiring to voluntarily Transfer such Membership Interest, shall notify the Company following which the Company and the remaining Members shall have the options to purchase such interest according to the terms of Section 13.3, except that the purchase price shall be the amount of a bona fide purchase offer from a third party in the event such an offer has been received. If no such third party offer has been received, the purchase price shall be determined pursuant to Section 13.5 below.

~~1.4~~12.4 **Rights of Transferee.** Unless admitted to the Company in accordance with Section 12.3, the Transferee shall not be entitled to any of the rights, powers or privileges of its predecessor in interest, except that it shall be entitled to receive and be credited or debited with its proportionate share of Profits, Losses, Gains from Capital Transactions, Cash Flow, Sales Proceeds, Refinancing Proceeds and Distributions in liquidation (as adjusted for the Capital Account).

## ARTICLE XIII - BUY-SELL

~~1.1~~13.1 **Buy-Sell.** Each of the following events shall constitute a "Buy-Sell Event" under this Agreement:

(a) The death or judicial determination of incompetency of a Member;

(b) The dissolution and winding-up of a Member;

(c) A judicial determination of the insolvency of a Member;

(d) Any filing of a petition or suit under the bankruptcy laws by or against a Member that is not dismissed within sixty (60) days;

(e) Any purported voluntary or involuntary Transfer or Encumbrance of all or any part of a Member's Membership Interest except as otherwise permitted by this Agreement;

(f) Any material breach of this Agreement by a Member which is not cured within ten (10) days after written notice of such breach is given to the Member by the Company;

(g) Any withdrawal by a Member from the Company other than as may be expressly permitted by this Agreement;

(h) Upon a determination by the Board of Managers that state or federal regulations or laws, or any legal developments thereunder, as applied to the Membership Interest of any Member, would adversely affect (or potentially adversely affect), in a manner deemed substantial by the Board of Managers, the operations of the Company or the affected Member;

(i) The failure or refusal of any physician Member to maintain malpractice insurance in an amount acceptable to the Board of Managers of the Company in its sole discretion;

(j) The loss by any physician Member of privileges at the Facility due to action taken by the Facility's Quality Control Committee or any similar body;

(k) The retirement of any physician Member from the practice of medicine;

(l) A change in control of a Member. "Change in Control" means: (i) a transaction resulting in a change of 50% or more of the persons that possess the power to elect at least one-half of the equity holders of the governing body of a Member; (ii) the sale, lease or other disposition of all or substantially all of the consolidated assets of a Member; or (iii) a merger, consolidation or reorganization of a Member with or into another entity, and as a result of such transaction, less than a majority of the voting shares or membership interests of such entity immediately after such transactions are held in the aggregate by the persons holding such voting shares or membership interests immediately prior to such transaction; and

(m) In the case of ASC, the Management Agreement is terminated by the Company due to a default by the Management Agent if an affiliate of ASC is still serving in such capacity at the time of the default.

In the event that any of the foregoing Buy-Sell Events should occur to any equity holder of a Member, the applicable Buy-Sell provisions set forth within this Article XIII shall apply to the proportionate interest in such Member previously held by the Person to which the Buy-Sell Event occurred subject to the entity Member's right to substitute an eligible equity holder as described in Section 4.2 of this Agreement.

~~1.2~~13.2 **Buy-Sell Notice.** Upon the occurrence of a Buy-Sell Event, the Member to whom such event has occurred (the "Withdrawing Member") or his or her legal representative shall give notice of the Buy-Sell Event (the "Buy-Sell Notice") to the Company and the other Members within ten (10) days after its occurrence. If the Withdrawing Member fails to give the Buy-Sell Notice, any other Member may give the notice to the Company and other Members at any time thereafter and by so doing commence the Buy-Sell procedure provided for in this Article XIII.

~~1.3~~13.3 **Purchase Option.**

(a) Immediately following the occurrence of a Buy-Sell Event, the Company shall have an option to purchase (the "Purchase Option") the Withdrawing Member's Units on the terms and conditions as set forth in Sections 13.5 and 13.6. The Company must give notice of its election to exercise its Purchase Option to the Withdrawing Member within three (3) months after the notice of an occurrence of a Buy-Sell Event.

(b) In the event the Company does not elect to exercise its Purchase Option, then each of the remaining Members, except the Withdrawing Member and any other Withdrawing Member, shall have an option to purchase the Membership Interests held by the Withdrawing Member at Closing on the terms and conditions as set forth in Sections 13.5 and 13.6, but subject to the applicable aggregate ownership limits of Section 4.2. This right will be allocated among the Members who meet the applicable class qualification requirements and elect to purchase the Withdrawing Member's Membership

Interest (the "Purchasing Members") in the proportion they mutually agree upon, or, in the absence of agreement, in the ratio that each Purchasing Member's Percentage Interest bears to the aggregate Percentage Interests of all Purchasing Members but taking into account the effect of the limitations of Section 4.2. In addition, upon Closing all Units, regardless of class, purchased by Purchasing Members pursuant to this Section 13.3(b) shall automatically be converted into the class of Unit held by such Purchasing Member immediately prior to Closing. To exercise their Purchase Option, the Purchasing Members must give notice of their election to the Withdrawing Member and the Company within the three (3) month period following expiration of the Company's option set forth in Section 13.3(a). Following the aforementioned three (3) month period, the Withdrawing Member shall be free to sell his or her Membership Interest to any Person who does not compete with the Facility, for any price subject only to the Company's right of first refusal for a period of thirty (30) days to match such third party offer according to its terms and purchase the Withdrawing Member's Membership Interest. Accordingly, the Withdrawing Member agrees to notify the Company upon its receipt of a bona fide third-party offer in order that the foregoing right of first refusal may be exercised.

~~1.4~~13.4 **Assignment of Purchase Option.** If, upon the occurrence of a Buy-Sell Event, there exist only two (2) then-current Members (including the Withdrawing Member), the Member that is not withdrawing shall have the option during the period set forth in Sections 13.3(a) to assign the Company's Purchase Option to any Person (the "Purchase Option Assignee") by notifying the Withdrawing Member of such assignment in writing. After delivery of such notice, the Purchase Option Assignee shall have the option to purchase the Withdrawing Member's Membership Interest on the same terms and conditions as would apply to the Company and Member from which the Purchase Option was assigned. Notwithstanding any other provision of Article XII or this Article XIII, any Purchase Option Assignee which exercises its Purchase Option, as provided herein (i) shall only have those rights as specified in Section 12.4 above; (ii) shall not be admitted as a substitute Member without full compliance with Section 12.3; and (iii) shall be subject to the Buy-Sell restrictions imposed under this Article XIII. In the event the Purchase Option Assignee does not exercise the Purchase Option, the Purchase Option Assignee shall have no further rights under this Agreement.

~~1.5~~13.5 **Agreement on Valuation.**

(a) The purchase price for the Withdrawing Member's Membership Interest under Sections 13.3 shall be the "fair market value" of the Withdrawing Member's Membership Interest as determined by agreement between the parties, or if no such agreement exists, an amount equal to the Withdrawing Member's share of the Company's taxable income as shown on the Company's federal income tax return for its immediately preceding tax year multiplied times 2.5.

(b) In the case of a Buy-Sell Event specified in Section 13.1(a), 13.1(h) or 13.1(k), if the Company, and the Members other than the Withdrawing Member do not exercise their respective Purchase Options described in Section 13.3 and the Withdrawing Member has not sold or otherwise transferred the Withdrawing Member's Membership

Interest, the Company shall, no later than four (4) years following the date of the occurrence of the applicable Buy-Sell Event either (i) purchase the Withdrawing Member's Membership Interest for a purchase price as determined under Section 13.5(a) at the Closing, or (ii) procure a buyer for the Withdrawing Member's Membership Interest who shall be acceptable to the Board of Managers in accordance with Section 12.3(b) and shall purchase the Withdrawing Member's Membership Interest for a purchase price as determined under Section 13.5(a) at the Closing.

~~1.6~~13.6 **Closing.** The closing (the "Closing") of the purchase of any Membership Interest pursuant to this Article XIII shall take place on the date agreed upon by the Company or the Purchasing Member(s), as the case may be, and the Withdrawing Member, but not later than thirty (30) days after the last exercise of the option to purchase. The purchase price for each Membership Interest being purchased will be payable as follows: (i) with respect to all Buy-Sell Events occurring during the five-year period beginning on the date of this Agreement (the "Initial Transfer Period"), the purchase price shall be paid by the Company or each Purchasing Member(s) as the case may be at Closing by delivery of a promissory note to the Withdrawing Member bearing interest at the "prime rate" of interest as set out in the Wall Street Journal, Western Edition last published prior to the date of the Closing, rounded to the nearest whole 1/4 percent, and payable in twenty (20) equal installments of principal and interest on each January 15, April 15, July 15 and October 15 thereafter (each a "Quarterly Payment Date") until paid, commencing on the first Quarterly Payment Date following the Closing or the Company may elect to pay the purchase price in full in cash at the Closing; and (ii) with respect to all Buy-Sell Events occurring after the Initial Transfer Period, unless otherwise agreed to in writing between the Withdrawing Member and the Company, or Purchasing Member(s) as the case may be, the purchase price shall be paid in full in cash at the Closing. Upon payment of the purchase price, the Withdrawing Member shall execute and deliver such assignments and other instruments as may be reasonably necessary to evidence and carry out the transfer of such Membership Interest to the Purchasing Member(s). In connection with the sale of any Membership Interest under this Article XIII, unless otherwise agreed by the Company, or Purchasing Member(s) as the case may be and the Withdrawing Member, the Company, or Purchasing Member(s) as the case may be will assume the Withdrawing Member's allocable portion of Company obligations to the extent related to the transferred interest as well as the seller's individual obligations to the extent related to the transferred interest, other than income tax liabilities of the Withdrawing Member. Notwithstanding any other provision of Article XII or this Article XIII, any transferee, assignee or purchaser of a Member's Membership Interest, as provided herein, shall only have those rights as specified in Section 12.4, and shall not be admitted as a substitute Member without full compliance with Section 12.3.

~~1.7~~13.7 **Effect on Withdrawing Member's Interest.** From the date of the occurrence of the Buy-Sell Event to the date of Closing of the transfer of the Withdrawing Member's Membership Interest under this Article XIII, the Withdrawing Member's Membership Interest will be excluded from any calculation of aggregate Membership Interests for purposes of any approval required of Members under this Agreement. Without limiting the generality of any other provision of this Agreement, upon the exercise of the Purchase Option, the Withdrawing Member, without further action, will have no rights in the Company against the Company or any

Member other than the right to receive payment for its Membership Interest in accordance with this Article XIII.

~~1.8~~13.8 **Failure to Exercise Purchase Option.** Subject to the Company's right of first refusal set forth in Section 13.3(b), in the event the Company, Members or Purchase Option Assignee, if any, do not exercise their Purchase Options with respect to the Withdrawing Member's entire Membership Interest, then the Withdrawing Member shall have the right to sell any remaining Membership Interest to any Person who is not in violation of the terms of Section 4.10 on the date of such purchase, but subject to the ownership limitations of Section 4.2, at any negotiated price; provided, however, that any Transferee of such Membership Interest, (i) shall only have those rights as specified in Section 12.4; (ii) shall not be admitted as a substitute Member without full compliance with Section 12.3; and (iii) shall be subject to the Buy-Sell restrictions imposed under this Article XIII.

~~1.9~~13.9 **Issuance of Replacement Units.** In the event that the Company purchases any interest of any Withdrawing Member, the Board of Managers may issue new Units of the same class without the requirement of approval by the Membership, at such price and at such time as the Board of Managers may in its sole discretion determine, subject to the limitation on aggregate ownership set forth in Section 4.2. It is expressly contemplated that the Company may issue such replacement Units for a contribution that is less than the amount originally paid by the Company for the Units with respect to which the replacement Units are issued.

**13.10 Company Call on ASC Units**. At any time following the performance of ASC under the Management Agreement for a period of five (5) years from the commencement of operations of the Facility, the Company, upon 30 days written notice, shall have the option to elect to purchase up to five (5) of the fifteen Units owned by ASC upon the terms specified in Sections 13.5 and 13.6 of this Agreement.

## ARTICLE XIV - DISSOLUTION AND LIQUIDATION OF THE COMPANY

~~1.1~~14.1 **Dissolution Events.** The Company will be dissolved upon the happening of any of the following events:

(a) All or substantially all of the assets of the Company are sold, exchanged or otherwise transferred (unless the Members have elected to continue the business of the Company, in which event the Company will continue until the Members elect to dissolve the Company);

(b) Members holding more than 67% of the Percentage Interests sign a document stating their election to dissolve the Company;

(c) The entry of a final judgment, order or decree of a court of competent jurisdiction adjudicating the Company to be bankrupt and the expiration without appeal of the period, if any, allowed by applicable law in which to appeal;

(d) The expiration of the term of the Company;

(e) By action of the Board of Managers, upon a determination by the Board of Managers that state or federal regulations or laws, or any legal developments thereunder, as applied to the Company or to the Membership Interests of the Members, would adversely affect (or potentially adversely affect), in a manner deemed substantial by the Board of Managers, the operations of the Company or the Members; or

(f) The entry of a decree of judicial dissolution or the issuance of a certificate for administrative dissolution under the Act.

~~1.2~~14.2 **Liquidation.** Upon the happening of any of the events specified in Section 14.1, the Board of Managers, or any liquidating trustee elected by the Board, will commence as promptly as practicable to wind up the Company's affairs unless the Board or the liquidating trustee (either, the "Liquidator") determines that an immediate liquidation of the Company's assets would cause undue loss to the Company, in which event the liquidation may be deferred for a time determined by the Liquidator to be appropriate. Assets of the Company may be liquidated or distributed in kind, as the Liquidator determines to be appropriate. The Members will continue to share Cash Flow, Profits and Losses during the period of liquidation in the manner set forth in Articles X and XI. The proceeds from liquidation of the Company, including repayment of any debts of Members to the Company, and any Company assets that are not sold in connection with the liquidation will be applied in the following order of priority:

(a) To payment of the debts and satisfaction of the other obligations of the Company, including without limitation debts and obligations to Members;

(b) To the establishment of any reserves deemed appropriate by the Liquidator for any liabilities or obligations of the Company, which reserves will be held for the purpose of paying liabilities or obligations and, at the expiration of a period the Liquidator deems appropriate, will be distributed in the manner provided in Section 14.2(c); and

(c) To the payment to the Members of the positive balances in their respective Capital Accounts, pro rata, in proportion to the positive balances in those Capital Accounts after giving effect to all allocations under Article X and all Distributions under Article XI for all prior periods, including the period during which the process of liquidation occurs.

~~1.3~~14.3 **Articles of Dissolution.** Upon the dissolution and commencement of the winding up of the Company, the Board of Managers shall cause a Statement of Intent to Dissolve to be executed on behalf of the Company and filed with the Secretary. After all debts, liabilities, and obligations have been paid and discharged (or adequate provision made therefor) and all of the assets have been distributed to the Members, Articles of Dissolution to be executed on behalf of the Company and filed with the Secretary. The Members shall execute,

acknowledge and file any and all other instruments necessary or appropriate to reflect the dissolution of the Company.

## ARTICLE XV - MISCELLANEOUS

~~1.1~~15.1 **Records.** The records of the Company will be maintained at the Company's principal place of business or at any other place the Board of Managers selects, provided the Company keeps at its principal place of business the records required by the Act to be maintained there. Appropriate records in reasonable detail will be maintained to reflect income tax information for the Members. Each Member, at its expense, may inspect and make copies of the records maintained by the Company and may require an audit of the books of account maintained by the Company to be conducted by the independent accountants for the Company. The Company shall prepare and deliver to each Member, at least annually, financial statements that include a balance sheet and an income statement.

~~1.2~~15.2 **Reserves.** The Board of Managers may cause the Company to create reasonable reserve accounts to be used exclusively to fund Company operating deficits and for any other valid Company purpose. The Board may in its sole discretion determine the amount of payments to such reserve accounts.

~~1.3~~15.3 **Notices.** Any notice or other communication required by this Agreement must be in writing. Notices and other communications will be deemed to have been given when delivered by hand or dispatched by means of electronic facsimile transmission with receipt electronically acknowledged or nationally recognized air courier with notice of receipt obtained, or on the third business day after being deposited in the United States mail, postage prepaid. In each case, notice hereunder shall be addressed to the Member to whom the notice is intended to be given at its address set forth on Schedule I to this Agreement or, in the case of the Company, to its principal place of business. A Member may change its notice address by notice in writing to the Company.

~~1.4~~15.4 **Amendments.** Notwithstanding the grant of the power of attorney contained in Section 6.1.4 hereof, no amendment to the Articles of Organization or this Agreement (other than amendments (i) required to comply with the terms of the Act; (ii) adopted by the Board upon the advice of legal counsel which, in the Board's sole discretion, are necessary or advisable due to a change, or proposed change, of law impacting the ownership or operation of ambulatory surgical centers; or (iii) expressly permitted within this Agreement) will be valid or binding upon the Members or the Company, nor will any waiver of any term of the Articles of Organization or this Agreement be effective, unless in writing and signed by the Members holding at least a majority of the Percentage Interests in the Company; provided, however, that any provision of this Agreement requiring the consent, approval or action of more than a majority of the Percentage Interests in the Company of the Members may only be amended or waived by a written action signed by the Members holding the required Percentage Interests.

~~1.5~~15.5 **Additional Documents.** Each party hereto agrees to execute and acknowledge all documents and writings which the Board of Managers may deem necessary or expedient in the creation of the Company and the achievement of its purposes, including but not limited to, the Articles of Organization and any amendments or cancellation thereof.

~~1.6~~15.6 **Representations of Members.** Each member represents and warrants to the Company and every other Member that it (a) is fully aware of, and is capable of bearing, the risks relating to an investment in the Company, (b) understands that its interest in the Company has not been registered under the Securities Act or the securities law of any jurisdiction in reliance upon exemptions contained in those laws and (c) has acquired its interest in the Company for its own account, with the intention of holding the interest for investment and without any intention of participating directly or indirectly in any redistribution or resale of any portion of the interest in violation of the Securities Act or any applicable law.

~~1.7~~15.7 **Survival of Rights.** Except as provided herein to the contrary, this Agreement shall be binding upon and shall inure to the benefit of the parties, their successors and assigns.

~~1.8~~15.8 **Interpretation and Governing Law.** When the context in which words are used in this agreement indicates that such is the intent, words in the singular number shall include the plural and vise versa. The masculine gender shall include the feminine and neuter. The Article and Section headings or titles shall not define, limit, extend or interpret the scope of this Agreement or any particular Article or Section. This Agreement shall be governed and construed in accordance with the laws of the State of Ohio without giving effect to the conflicts of laws provisions thereof.

~~1.9~~15.9 **Severability.** If any provision, sentence, phrase or word of this Agreement or the application thereof to any person or circumstance shall be held invalid, the remainder of this Agreement, or the application of such provision, sentence, phrase or word to persons or circumstances, other than those as to which it is held invalid, shall not be affected thereby.

~~1.10~~15.10 **Agreement in Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. In addition, this Agreement may contain more than one counterpart of the signature pages and this Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterparts, signature pages; all of such signature pages shall be read as though one, and they shall have the same force and effect as though all the signers had signed a single signature page.

~~1.11~~15.11 **Tax Matters Manager.** For purposes of this Agreement, the Board of Managers may designate a Member as the Tax Matters Manager.

~~1.12~~15.12 **Creditors Not Benefited.** Nothing in this Agreement is intended to benefit any creditor of the Company or of any Member. No creditor of the Company or of any Member will be entitled to require the Members to solicit or accept any loan or additional capital

contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

~~1.13~~15.13 **Accounting Method.** The Company shall adopt the accrual method of accounting.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly adopted by the Company to be effective as of the ___ day of __________, 1999 and do hereby assume and agree to be bound by and to perform all of the terms and provisions set forth in this Agreement.

**MEMBER:**

______________________________

444385

# SCHEDULE I

| <u>Names and Addresses of Members</u> | <u>Capital Contribution</u> | Units | <u>Percentage Interest</u> |
| --- | --- | --- | --- |

**<u>Class I Members</u>**

________________________________________
________________________________________
________________________________________

________________________________________
________________________________________
________________________________________

________________________________________
________________________________________
________________________________________

| | Capital Contributions | Units | Percentage Interest |
|---|---|---|---|

**Class II Members**

Key Pain Management & Treatment Center
2020 Hayes Avenue, Suite G
Sandusky OH 44870

Alfred Kafity, D.O.
34 Executive Drive
Norwalk OH 44857

Firelands Internal Medicine, Inc.
______________________
______________________

Kamal Chaban, M.D.
703 Tyler Street
Sandusky OH 44870

Normand Caron, M.D.
2819 Hayes Avenue, Suite 7
Sandusky OH 44870

Robert W. Rice, M.D., Inc.
2525 Columbus Avenue
Sandusky OH 44870

Steve Shine, M.D.
48 Executive Drive
Norwalk OH 44857

Bone & Joint Surgery, Inc.
______________________
______________________

John Parschauer, D.O.
______________________
______________________

North Central Ohio Ear, Nose & Throat
Associates, Inc.
2020 Hayes Avenue, Suite G
Sandusky OH 44870

| | Capital Contributions | Units | Percentage Interest |
|---|---|---|---|
| **Class III Member** | | | |
| ASC Group, LC<br>PO Box 683070<br>1700 Park Avenue Suite 2000<br>Park City UT 84068 | | | |

ALL-STATE LEGAL EXHIBIT B

# DEVELOPMENT AND MANAGEMENT AGREEMENT

THIS DEVELOPMENT AND MANAGEMENT AGREEMENT (the "Agreement") is executed and delivered this 5th of August, 1999, by and between Executive Health Drive Surgical and Diagnostic Center, an Ohio limited liability company ("Owner"), ASC MANAGEMENT, L.L.C., a Utah limited liability company ("Manager") and ASC Group, LC, a Utah limited liability company ("ASC").

## RECITALS

A. Owner desires to develop, own and operate a multi-specialty ambulatory surgery center located in Sandusky, Ohio (the "Center").

B. Owner desires to employ ASC and Manager under the terms of this Agreement to provide their skills, supervision and certain personnel to develop and operate the Center, with the full authority and ultimate control of the Center remaining in Owner, to the extent that said authority is not expressly delegated to Manager under the terms of this Agreement.

C. ASC and Manager are desirous of performing the development and management services for Owner.

**NOW THEREFORE**, in consideration of the premises and the mutual promises and covenant of the parties hereunder, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Services and Duties.

1.1 Independent Contractor Relationship. Owner hereby retains ASC and Manager and ASC and Manager hereby agree to develop and manage the Center, subject to all the provisions hereof. The parties hereto acknowledge that at all times during the Term hereof, ASC and Manager shall be independent contractors and that Owner shall not assume any liability for the withholding or payment of any federal, state or local taxes to ASC and Manager for ASC's and Manager's services provided hereunder. ASC and Manager shall be responsible for the payment of all wages, payroll taxes, fringe benefits and any other expenses that may become owing to or on behalf of all persons employed by ASC and Manager in providing services under this Agreement.

1.2 Authority and Responsibility of ASC. Owner acknowledges that ASC has been engaged hereunder solely to perform the "pre-operations" business development tasks described on Exhibit "A" hereto and that ASC is hereby authorized to implement the Major Decisions approved by the Board which constitute business development tasks. Unless expressly indicated otherwise, all references to "Manager" herein shall be taken to include references to ASC as is necessary to clarify ASC's rights, obligations and responsibilities solely with regard to the pre-operations development of the Center. Following the opening

of the Center, ASC shall bear no responsibility for, or owe Owner obligations with regard to, the management or operations of the Center.

1.3 Control Retained in Owner. Owner, acting through its Board of Managers (the "Board"), shall at all times retain control over the assets and operation of the Center, Manager shall perform the functions described in this Agreement in accordance with the policies and directives given by Owner to Manager. By entering into this Agreement, Owner does not delegate to Manager any of the powers, duties and responsibilities required to be retained by Owner under law (including all certificates and licenses issued under authority of law for operation of the Center by Owner). Owner may, according to the terms of this Agreement, direct Manager to implement existing policies and may adopt as the Center policy recommendations or proposals made by Manager. Owner shall be owner and holder of all licenses, accreditation certificates and contracts which Owner obtains and shall be the "Provider" within the meaning of all third party contracts for surgical services. Further, the Board shall be the governing body of the Center and shall be responsible for the control, policy making and direction of the Center.

1.4 Major Decisions. Notwithstanding anything to the contrary within this Agreement, the following actions shall require the prior written authorization of the Board prior to being undertaken by Manager:

(a) The sale of assets of Owner not in the ordinary course of business;

(b) A material change of the business of Owner, or in the scope of services offered at the Center, including the material modification of any material license, permit or contract of Owner (expressly including this Agreement);

(c) Engaging in any transactions which could result in the termination or reorganization of Owner or the partial or total dissolution of all of the Members' interests in Owner;

(d) The purchase of assets not related to the business of Owner;

(e) Approval of the annual budget for the Center;

(f) Capital expenditures in any one fiscal year of the Center exceeding $25,000, which are not provided for within the Center's annual budget;

(g) The incurrence of debt or leases by the Center other than in the ordinary course of business;

(h) The establishment or change of the Center's retail price schedule for services;

(i) Any contract required by state law or regulation relating to the provision of anesthesia services;

(j) Establishment of or changes in credentialing policies and protocols, except that no such approval shall be required if a change is dictated by applicable laws or national standards;

(k) Establishment of or changes in the Center's quality assurance plan, except that no such approval shall be required if a change is dictated by applicable laws or national standards;

(l) Any real property lease or modification of such a lease for the Center; or

(m) Approval and payment of distributions to members of Owner from the proceeds realized through the Center's operations.

Notwithstanding the provisions of this Section 1.4, Manager shall be entitled, at its discretion, to decline to take any action relating to the development or operation of the Center without first receiving the express written approval of such action by the Board.

1.5 Medical and Professional Matters. All medical and professional matters shall be the responsibility of Owner and the medical staff of the Center. Manager shall, however, consult with Owner concerning such matters if requested to do so. In the event of a non-medical emergency relating to the health or safety of a patient or worker, Manager may take such actions as it believes to be necessary on behalf of Owner. In the event of a medical emergency relating to the health or safety of a patient or worker, Manager may take such actions as it believes to be necessary on behalf of Owner as stipulated in the Center's policies and procedures manual.

1.6 Authority and Responsibility of Manager. Subject to the provisions of Section 1.4, Manager shall have authority and responsibility to provide business development services for the Center and to conduct, supervise and direct the day-to-day operations of the Center. Manager is hereby authorized to implement or cause to be implemented all Major Decisions approved by the Board and to conduct or cause to be conducted the ordinary and usual business and affairs of the Center in accordance with and as limited by this Agreement. In the absence of direction or written policies of Owner, Manager shall exercise reasonable judgment in its management activities. Subject to Owner's direction and approval, Manager shall specifically have responsibility and commensurate authority over the written policies of Owner, and budgets approved by Owner as hereinafter provided, for the following activities:

(a) Construction. Following the opening of the Center, Manager shall negotiate and, when approved by the Board, supervise the performance of contracts

covering (i) improvements to the Center, and (ii) the furnishings and equipping of the Center as agreed upon by the Center's landlord.

(b) Accounting and Financial Records. Manager shall establish and administer accounting procedures and controls and establish and administer systems for the development, preparation, and safekeeping of records and books of account relating to the business and financial affairs of Owner.

(c) Budgets. Not less often than once each fiscal year of Owner, Manager shall cause to be prepared and submit to the Board for its consideration a budget (the "Budget") setting forth the estimated receipts and expenditures (capital, operating and other) of Owner for the period covered by the Budget. When approved by the Board, Manager shall in good faith use its best efforts to implement the Budget and shall be authorized, without the need for further approval by the Board, to make the expenditures and incur the obligations provided for in the Budget (and those outside of the Budget as limited by Section 1.4(f)).

(d) Personnel Administration. Manager shall hire, discharge, establish the terms of employment, train, supervise and manage all personnel working at the Center other than physicians on the Center medical staff. Such duties shall include, but shall not be limited to, (i) control of all labor relations, (ii) control of hiring and firing of employees, (iii) determining wages, benefits and terms and conditions of employment for employees, (iv) supervising of employees, (v) determining job descriptions, number of employees needed for staffing and the nature and extent of job classifications, and (vi) maintaining all payroll functions. The parties hereto acknowledge that Manager may subcontract with a third party to provide some or all or these services. The gross payroll costs (plus 3%) and costs of benefits and liability and other applicable insurance coverages for all persons employed by Manager or Manager's designee to provide these services shall be reimbursed to Manager in addition to any other fees payable under this Agreement. Owner and its Board shall be named as additional insureds on all liability policies of Manager.

(e) Contracts, Leases and Purchases. Manager may enter into agreements on behalf of Owner for:

(i) equipment, operating supplies and other materials and supplies which may be needed for the maintenance and operation of the Center;

(ii) the furnishing of such utilities, services and concessions as may be necessary for the maintenance and operation of the Center including but not limited to, janitorial, landscaping and snow removal services; and

(iii) such repairs as shall be necessary to keep and maintain the Center in good working order and condition.

(f) Collection of Accounts. Manager shall supervise the issuance of bills for services and materials furnished by Owner at the Center and collect accounts and monies owed to Owner arising out of the operation of the Center.

(g) Legal Action. Manager shall initiate any and all legal actions or proceedings on behalf of Owner necessary to collect charges or other income due Owner arising out of the operation of the Center, excluding those actions not exceeding $500 per case. However, prior to initiating legal actions or proceedings, Manager shall call the physician of record, if any, relating to the subject matter in order to determine if extenuating circumstances exist.

(h) Payment of Accounts and Indebtedness. Manager shall pay the payroll, rent, trade accounts, amounts due on short and long-term indebtedness, taxes and all other obligations of Owner arising out of the operation of the Center and shall pay distributions to the constituent members of Owner, provided, that Manager's responsibility under this Section 1.6(h) shall be limited to the exercise of reasonable diligence and care to apply the funds collected in the operation of the Center to Owner's obligations in a timely and prudent manner, and Manager shall have no separate liability with respect to any obligation of the Center or Owner.

(i) Depositories for Funds. Manager shall maintain interest bearing and non-interest bearing accounts in such banks, savings and loan associations, and other financial institutions as the Board may select, with such balances therein as Manager shall from time to time deem appropriate, taking into account the operating needs of the Center and the disbursements from such accounts of such amounts of Owner's funds as Manager shall from time to time determine appropriate in the discharge of its responsibilities under this Agreement; provided, however, that Manager shall not under this Agreement have any obligation to supply, out of its own funds, working capital for the Center.

(j) Compliance with Laws and Regulations. Manager shall arrange, at Owner's expense, for compliance in all material aspects with all statutes, ordinances, laws, rules, regulations, orders and determinations affecting or issued in connection with the Center and make arrangements for any alterations or repairs to the Center ordered or required thereby.

(k) Other Services. Manager shall perform other normal business functions and otherwise operate and manage the business and affairs of Owner in accordance with and as limited by this Agreement.

Manager shall be obligated to perform its responsibilities and obligations under this Agreement only to the extent that Owner makes available to Manager adequate funds and resources.

1.7 Contracts for Services. Except as specifically provided otherwise in Section 1.4(i) hereof, Manager is empowered to negotiate, enter into, terminate and administer on behalf of Owner, contracts for services by medical, paramedical, and other persons and organizations with Board approval; provided, that no lease of space or equipment with any such physician, or any other person, shall be entered into without all governmental approvals required by law.

1.8 Special Projects. Manager may from time to time engage consultants to perform projects and studies and to render advice in connection with the operations of the Center, upon obtaining the prior written approval of the Board. Consultants shall not be considered employees of Manager, and, except for consultants engaged to assist ASC in rendering business development services (who or which shall be compensated by ASC out of fees payable under Section 6.1(a)), all amounts of their reasonable expenses and fees shall be paid directly by Owner to Manager, or if Manager shall so request, said amounts shall be paid directly to the consultant involved.

1.9 Force Majeure. Manager shall not be deemed to be in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including, without limitation, strikes or civil disturbance, lack of Owner's financial resources, any actions taken by Owner (or the failure by Owner to act), any statute, regulation or rule of the federal or any state or any local government, or any agency thereof.

1.10 Revenues and Payments. Except as provided in Section 6 hereof, all income or other monies received from the operation of the Center, together with all accounts and other receivables and all other assets or property generated, created, or which shall accrue from the operation of the Center, shall belong to Owner and shall be its property absolutely. Payment of all operating costs, wages, salaries and fees incurred or sustained in the operation of the Center is solely the obligation and responsibility of Owner. Manager shall determine the method and manner in which checks shall be authorized and signed.

1.11 Manager's Working Space. During the Term of this Agreement, Owner shall provide Manager and its employees or subcontractors (as described herein) such working space and resources within the Center as are required to perform their duties as described within this Agreement.

1.12 Additional Services Provided by Manager. In addition to the services and duties of Manager described in this Article 1, Manager shall also perform for the benefit of Owner and the Center those services listed and described in Exhibit "A" attached hereto.

2. Meetings of Manager with the Board Representative and the Board. Throughout the Term of this Agreement, a representative of Manager shall meet monthly with the Board at large, or at the Board's discretion, the Board Representative (as defined below). In addition, the Board shall be entitled to request an additional two meetings per quarter with a representative of Manager upon three days' written notice. Throughout the Term of this Agreement, the Board shall designate

a representative to communicate on behalf of the Board (the "Board Representative"), which person shall be a member of the Board as then constituted. In addition to the meetings described above, within 30 days of the expiration of each fiscal year for the Center, Manager shall meet with the Board at large in order to review the results of the preceding year, set the coming year's Budget and determine performance goals for Manager and the Center.

3. Manager's Employees. Owner and Manager shall agree upon the appointment of and salary for (i) an administrative director of the Center (the "Facility Administrator"), and (ii) an accounts payable and billing and collections representative who shall be the employees of Manager. As long as the Management Fee, pursuant to Section 6.1(b) remains at 7.5% of Collected Net Revenues, the salary for said Facility Administrator shall be borne by the Manager. If, at any time, the Management Fee is less than 7.5% of Net Collected Revenues, the salary for said Facility Administrator shall be borne by Owner. The salary and other costs associated with the accounts payable and billing and collections representative shall be the responsibility of Manager. The Facility Administrator will be the daily operational director of the Center and shall serve under the direct supervision of Manager. If the Facility Administrator's general performance is unacceptable either to Owner or Manager, the Administrator's appointment will be terminated.

4. Approval Procedure; Reports.

4.1 Approval Presumed. Except in cases involving Major Decisions, Manager shall be entitled to take any action required hereunder without first obtaining the Board's approval, subject to the Board's right to provide express instructions on any matter involving the Center that must then be followed by Manager. Notwithstanding the foregoing, Manager may seek the prior approval of any action to be taken, or the ratification of any action previously taken, hereunder from the Board. In cases where Manager seeks such approval or ratification during the performance of its duties under this Agreement, such approval or ratification shall be deemed to be granted if Manager shall provide a description of its actions in writing to the Board Representative and no written response is received within five business days following Manager's receipt of verbal confirmation from the Board Representative of his or her receipt of Manager's communication.

4.2 Authorization by the Board. In any situation that requires Board approval, action or confirmation, Manager shall be entitled to rely upon the written statement of the Board Representative that such action or approval has been taken or given. Delivery of a report to the Board Representative by Manager shall constitute delivery to the Board and/or Owner.

5. Accounting, Communications and Reports.

5.1 Fiscal Year. The fiscal year of Owner ends on the last day of December of each year, unless the Internal Revenue Service shall require otherwise.

5.2 Books and Records. The books of account of Owner shall be kept and

maintained at all times at the offices of Manager. The books of account shall be maintained on an accrual basis in accordance with generally accepted accounting principles, consistently applied, and shall show all items of income and expense.

5.3 Financial Information. Manager shall prepare and furnish to the Board (i) for each calendar month, an unaudited income statement, reflecting the operations of Owner for such month, including a list of case volume by provider at the Center, and (ii) for each quarter, an unaudited income statement, balance sheet and cash flow statement, the balance in each of Owner's members' capital accounts, the unpaid balance due under all obligations of Owner, a statement of aged accounts receivables, a list of case volume by provider and other information reasonably requested by the Board. After the close of each fiscal year of Owner, Manager shall cause to be prepared and furnished promptly to the Board a balance sheet of Owner dated as of the end of the fiscal year, a related statement of income or loss for Owner for such fiscal year, and the same information for the fiscal year as is required to be included in the aforementioned quarterly reports. Year end tax information shall be prepared for, and submitted to, the members of Owner in a timely manner by Manager. Should the Board request, Manager shall arrange for the review or audit of, at Owner's expense, of the year end financial statements for Owner by an independent accounting firm. Notwithstanding anything within this Agreement to the contrary, all financial books and records of the Center prepared by or at the request of Manager shall remain the property of Owner.

5.4 Audits. The Board shall have the right, upon reasonable notice, to audit, examine and make copies of, or extracts from, the books of account of the Center during usual business hours. The Board shall bear all expenses incurred in any such examination made.

5.5 Information for the Board. The Facility Administrator shall attend the regular meetings of the Board, and in cooperation with Owner's Secretary and Treasurer, prior to each meeting, shall have prepared and mailed to each Board member an agenda, the minutes of the previous meeting and the monthly financial information described above, as well as such additional financial or statistical information as shall have been requested by Manager.

6. Fees.

6.1 Fees. As compensation for the development and management services to be rendered hereunder, Owner shall pay Manager the following fees:

(a) Business Development Fee. For ASC's performance of the pre-opening business development or "set up" services rendered on Owner's behalf and described on Exhibit "A" hereto, ASC shall be paid the sum of $302,500, payable in six monthly installments of $50,416.66 each with the first such installment due and payable upon the execution of this Agreement.

(b) Management Fee. For Manager's supervision of Center operations, including, but not limited to, accounting and tax in the ordinary course of business, as more fully described in this Agreement and on Exhibit "A", a management fee not to exceed the greater of (i) $15,000 per month, or (ii) seven and one-half percent (7.5%) of the monthly Collected Net Revenues (as defined below) derived from the operation of the Center. In no event, however, may the management fee payable under this Section 6.1(b) exceed $315,000 during any year of the Term. Notwithstanding the foregoing, following the third anniversary of this Agreement, Owner shall have the option, upon 30 days written notice to reduce the management fee payable to the greater of (i) $6,000 per month, or (ii) 4.5% of the monthly "collected net revenues" by assuming full responsibility for those tasks designated on Exhibit "A" attached hereto.

(c) Reimbursement of Costs. ASC and Manager shall also be entitled to reimbursement for all actual out-of-pocket costs incurred in providing services under this Agreement and approved in the budget, subject to Board approval (*i.e.*, costs incurred in satisfying any direct obligations of the Center, marketing materials prepared on behalf of the Center, travel and lodging costs incurred during the performance of the business development services required hereunder). Extraordinary costs not contemplated by the budget may be submitted to the Board for their approval.

(d) No Charge for Overhead; Time of Payment. Except as otherwise provided herein, such compensation shall constitute full and complete compensation for all services rendered by ASC or Manager pursuant to this Agreement, including the services listed in Exhibits "A" attached hereto. Except as otherwise provided herein, no additional charge shall be made by ASC or Manager or any affiliate of ASC or Manager for the services of its employees, independent contractors or for overhead expenses. All monies due to ASC or Manager under Section 6 shall be paid on a monthly basis, within 10 days of the end of each month.

6.2 "Collected Net Revenues" Defined. "Collected Net Revenues" shall be determined upon an accrual basis and shall mean the collected gross revenue of the Center less adjustments for bad debts, contractual adjustments, maximum amounts payable under governmental health care programs, and other discounts or allowances as may exist from time to time.

6.3 Managed Care Contracting Costs. It is the intent of the parties that fees payable to any entity engaged by Owner for the purpose of locating and negotiating managed care contracts for the Center shall not be included within the fees payable to Manager hereunder and shall be governed by a separate agreement between such party and Owner.

6.4 Uncollectible Accounts. The allowance for uncollectible accounts of the Center shall be adjusted periodically (no less often than annually) to reflect historical

collections of accounts receivable and reconciled annually, and such adjustments and reconciliations shall be made in accordance with generally accepted accounting principles. Within 60 days after the end of each fiscal year of Owner, an adjustment shall be made to the amount of the management fee paid to Manager during the previous fiscal year to reflect the increase or decrease in the allowance for bad debts pursuant to this Section. The purpose of this Section is to ensure that the management fee payable or paid to Manager is not too high or too low as a result of an understated or overstated allowance for bad debt.

7. Term of Agreement.

7.1 Term. The term of this Agreement ("Term") shall commence on the date of the execution of this Agreement and shall continue in full force and effect for a period of five years from the date the first procedure is performed within the Center and shall automatically renew for successive three year terms unless either the Manager or the Owner give notice of their election of non-renewal at least 90 days prior to the expiration of any such term. Notwithstanding the foregoing, the management fee payable to Manager shall be due and payable only following the commencement of operations of the Center.

7.2 Termination for Cause. Either party may terminate this Agreement at any time for "cause" (as defined within this Section) upon delivery of written notice as hereinafter provided (such cause shall also constitute an "Event of Default" as that term is used in Section 8).

(a) Termination by Owner. Owner shall have "cause" for termination:

(i) If Manager shall default in the performance of any material covenant, agreement, term or provision of this Agreement and such default shall continue for a period of 60 days after written notice to Manager from the Board stating the specific default (unless Manager diligently pursues correction if such default is of a nature that cannot be reasonably corrected within said 60 day period);

(ii) Upon 30 days' written notice, if Manager shall intentionally engage in any fraudulent practices or willful misconduct or gross negligence which materially affects the business or reputation of the Center, including but not limited to conduct that evidences a willful disregard for patients treated at the Center; or

(iii) If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, file a voluntary petition for bankruptcy or admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or if

a creditor of Manager files an involuntary petition under any state or federal reorganization; insolvency, arrangement, bankruptcy or other debtor relief provision, and such petition is not dismissed within 30 days.

(b) Termination by Manager. Manager shall have "cause" for termination:

(i) If Owner shall default in the performance of any material covenant, agreement, term or provision and such default shall continue for a period of 60 days after written notice to Owner from Manager stating the specific default (unless Owner diligently pursues correction if such default is of a nature that cannot be reasonably corrected within said 60 day period); or

(ii) If the Center or any portion thereof shall be damaged or destroyed, or if any material assets of the Center shall be rendered incapable of normal operation, by fire or other casualty and if Owner fails to commence repairing, restoring, rebuilding or replacing any such damage or destruction within 90 days after such fire or other casualty, or fails to complete such work within a reasonable period of time; or

(iii) If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, file a voluntary petition in bankruptcy or admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or if a creditor of Owner files an involuntary petition under any state or federal reorganization, insolvency, arrangement, bankruptcy or other debtor relief provision, and such petition is not dismissed within 30 days; or

(iv) If through no fault of Manager, any license necessary for the operation of the Center is at any time suspended, terminated, revoked or should prove impracticable to obtain;

(v) If Owner shall fail to make any payments, or keep any covenants, owing to Manager; or

(vi) If Owner shall fail to make any payments owing to any third party which would cause Owner to lose possession of the Center's building, equipment or property.

7.3 Obligations Upon Termination. In the event of any termination under the terms of this Agreement, Manager will co-operate and assist in the orderly and efficient

transfer of all phases of the development and administration of the Center to any new administrator or management firm; provided, however, that Manager shall be entitled to reasonable and customary fees for its transition services. Upon termination Manager shall surrender to Owner all documents and records in its possession relating to the development or operation of the Center.

8. Default.

8.1 Remedies Upon Default. If any Event of Default by Owner shall occur and be continuing, Manager shall have any remedy available to it in law or equity on account of such Event of Default in addition to its right to terminate this Agreement under Article 7. Upon such termination, neither party shall have further obligations whatsoever under this Agreement, except for the provisions of Sections 7.3, 9.2 , 9.3, 9.4 10, and 11; and, in such event Manager shall be entitled immediately to receive payment of all amounts theretofore due and unpaid pursuant to the terms hereof and to interest at the statutory legal rate on any past due payments from the date due until paid.

8.2 Rights Cumulative; No Waiver. No right or remedy herein conferred upon or reserved to either of the parties hereto is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder, or now or hereafter legally existing upon the occurrence of an Event of Default hereunder. The failure of either party hereto to insist at any time upon the strict observance or performance of any of the provisions of this Agreement or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment thereof. Every right and remedy given by this Agreement to the parties hereof may be exercised from time to time and as often as may be deemed expedient by the parties hereto, as the case may be.

9. Insurance and Indemnification.

9.1 Insurance. Owner shall secure and maintain, or cause to be secured and maintained, during the Term of this Agreement, the following insurance relating to the Center:

| | |
|---|---|
| Workers Compensation | customary in the industry and locale |
| Professional | $1,000,000 per liability occurrence; $3,000,000 aggregate |
| General | $1,000,000 per liability occurrence; $3,000,000 aggregate |
| D & O | as the parties shall agree |

It is further agreed that all such policies, except worker's compensation insurance policies, are to be written to include Manager, its agents, servants, subcontractors, employees, members, officers, and managers, as additional named insureds.

9.2 Indemnification of Manager. Notwithstanding the existence of the insurance provided for above, Owner shall defend, indemnify and hold harmless Manager and its managers, members, agents, subcontractors and employees from and against liability for any and all costs (including court costs), expenses, fees (including reasonable attorneys' fees) and payments by, and losses and damages which arise out of, or are in any way connected with, the negligent or intentional acts or omissions of Owner, its managers, employees, members or agents (excepting Manager), or member of the medical staff at the Center, unless such act or omission is caused by the negligence or willful misconduct of Manager or one of its managers, members, employees, subcontractors or agents.

9.3 Indemnification of Owner. Notwithstanding the existence of the insurance provided for above, Manager shall defend, indemnify and hold harmless Owner, its managers, members, agents, and employees from and against liability for any and all costs (including court costs), expenses, fees (including reasonable attorneys' fees) and payments by, and losses and damages which arise out of, or are in any way connected with the negligent or intentional acts or omissions of Manager, its managers, members, agents, employees or subcontractors in the performance of their duties under this Agreement unless such act or omission is caused by the negligence or willful misconduct of Owner or its employees, managers, members or agents

9.4 Notice of Claims. If either party shall receive notice of any third-party claim, such party shall promptly provide written notice of such claim to the other party.

10. License to Proprietary Materials. "Documentation" means technical, procedural and administrative manuals, training materials, standard report forms and other materials that contain information regarding the operation and management of ambulatory surgery centers such as Center, which materials Manager delivers to Owner under this Agreement and which materials Manager shall use in performing services under this Agreement. Manager hereby grant to Owner, for the consideration recited elsewhere in this Agreement, a perpetual, non-exclusive and non-transferable license, without right to sublicense, to use the Documentation in accordance with the provisions of this Agreement. Owner is aware that this Agreement grants Owner no title or rights of ownership in the Documentation and that the Documentation is the proprietary information, trade secret and valuable property of Manager. Notwithstanding the foregoing, Manager acknowledges that Owner's license to the Documentation shall not terminate upon termination of the Agreement, provided that the only site at which the license shall be valid shall be the Center. As of the date of this Agreement, the Companies, to the best of its knowledge, is not sure of any such ongoing fees. Copying of the Documentation by Owner is not permitted except with the prior written consent of Manager. Owner shall reproduce all copyright and other proprietary markings of Manager and its suppliers contained in the Documentation. As provided in Section 11,

Owner agrees to maintain strict confidentiality with respect to the Documentation. The grant of the license herein is expressly conditioned upon Owner's payment of the fees specified in Section 6. All rights not specifically granted to Owner or reasonably implied by or needed for the rights granted to Owner under this Agreement, are retained by Manager.

11. <u>Non-Disclosure of Proprietary or Confidential Information.</u>

11.1 <u>Non-disclosure and Non-Use.</u> By operation of and performance under this Agreement, the parties may have access to information that is confidential or proprietary to the other party. "Proprietary or Confidential Information" consists of (a) the Documentation and any trade secrets related thereto; (b) any trade secrets or confidential information of Owner, including information disclosed by Owner to Manager or learned by Manager as a result of its access to the systems, data, files, documents, offices, property or personnel of Owner; and (c) any other information or data of a party disclosed to or learned by the other party that a reasonable person in like circumstances would understand to be confidential or proprietary information of the disclosing party. A disclosing party's Proprietary or Confidential Information shall not include information that:

(i) is or becomes a part of the public domain through no act or omission of the receiving party;

(ii) was in the receiving party's lawful possession prior to the time such information was disclosed to or learned by the receiving party from or by access to the disclosing party, and at the time of such prior possession the receiving party was not under a duty of confidentiality to the disclosing party with respect thereto;

(iii) is lawfully disclosed to the receiving party by a third party without restriction imposed by the third party on the receiving party's further disclosure of such information; or

(iv) is independently developed by the receiving party by its personnel not having access to such Proprietary or Confidential Information.

11.2 <u>When Required by Law.</u> Nothing in this Agreement shall prohibit any disclosure of Proprietary or Confidential Information by the receiving party when disclosure is required by law, regulation or court order, but only to the extent so required. The receiving party shall inform the disclosing party of the requirement and shall cooperate with the disclosing party in obtaining a protective order and other reasonable protections for the Proprietary or Confidential Information subject to disclosure.

11.3 <u>Reasonable Steps to Protect.</u> Each party agrees, both during the term of this Agreement and after termination of this Agreement, to hold the other party's Proprietary or Confidential Information in strict confidence. Each party agrees not to make the other party's Proprietary or Confidential Information available in any form to any third party or to use the

other party's Proprietary or Confidential Information for any purpose other than for the purposes explicitly permitted by this Agreement. The receiving party agrees to take all reasonable steps to ensure that Proprietary of Confidential Information of the disclosing party is not disclosed or distributed by the receiving party's employees, agents or consultants in violation of the provisions of this Agreement.

11.4 Patient Data. Manager shall have access to patient data, which it shall hold in strict confidence, and shall use only for the purposes of this Agreement. Manager shall instruct its personnel concerning the requirements of this paragraph. Patient data shall mean any data or information concerning patients or owner or of independent care givers, including without limitation, any of the treatments, procedures, medicines, drugs, diagnoses, therapies, surgeries, outcomes, histories, genetics, disclosures or behaviors of any such patients. The privacy and other rights of all patients shall be respected.

11.5 Equitable Relief. Each party acknowledges that any use or disclosure of the other party's Proprietary or Confidential Information other than as specifically provided for in this Agreement will result in irreparable injury and damage to the disclosing party not adequately compensable in monetary damages alone. Accordingly, each part hereby agrees that, in the event of use or disclosure by the receiving party of the disclosing party's Proprietary or Confidential Information (other than as specifically provided for in this Agreement or in another written agreement between the parties), the disclosing party shall be entitled to preliminary and permanent injunctive relief and other equitable relief as granted by any court of competent jurisdiction.

12. Miscellaneous.

12.1 Change in Law. If any law or governmental regulation is adopted or any court decision is promulgated after the date of this Agreement, and such law, regulation or court decision makes this Agreement or a provision hereof illegal, the parties agree to use their best efforts to restructure this Agreement in such a manner that will avoid such illegality and, to the extent practicable, will preserve the existing financial and business relationships among them.

12.2 Reasonable Care. Manager shall not, by developing or managing the Center, assume or become liable for any of the obligations, debts or liabilities of the Center or Owner. ASC or Manager shall have an obligation to exercise reasonable care in carrying out its obligations under this Agreement, including the handling, supervision and distribution of funds.

12.3 Access to the Center. Manager shall, at all times during the Term hereof, have complete access to the Center, its records, offices, and facilities, in order to carry out their respective obligations hereunder.

12.4 Restriction on Assignment. Neither party hereto may assign its interest in or

delegate the performance of its obligations under this Agreement, other than to an affiliate, to any other person without obtaining the prior written consent of the other party; provided, however that any such assignment requested by one party shall not be unreasonably withheld by the other party.

12.5 Successors. All the provisions herein contained shall be binding upon and inure to the benefit of the respective lawful successors and assigns of Manager and Owner.

12.6 Entire Agreement. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior understandings between the parties, whether written or oral, as to such subject matter. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the parties. No waiver shall be binding unless executed in writing by the party making the waiver.

12.7 Headings. The headings to the various sections of this Agreement have been inserted for reference purposes only and shall not modify, define, limit or expand the expressed provisions of this Agreement.

12.8 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, and such counterparts shall together constitute but one and the same Agreement.

12.9 Notices. All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given when hand delivered or three business days after deposit in the United States mail, if mailed by certified or registered mail, return receipt requested, postage prepaid and addressed: as follows:

| | |
|---|---|
| If to ASC: | ASC Group, LC<br>PO Box 683070<br>Park City, UT 84068<br>Attn: Richard B. Vincent |
| If to Manager: | ASC Management, L.L.C.<br>P.O. Box 819<br>2210 First Avenue<br>Dodge City, KS 67801<br>Attn: Daniel Tasset |
| With a copy to: | Lorin E. Patterson, Esq.<br>Ray, Quinney & Nebeker<br>79 S. Main Street<br>Salt Lake City, UT 84111 |

If to Owner: Executive Health Drive Surgical and Diagnostic Center

_________________________

_________________________

A party may change its address by giving notice in the manner provided above.

12.10 Authorization for Agreement. The execution and performance of this Agreement by Owner and Manager have been duly authorized by all necessary laws, resolutions or corporate or partnership action, and this Agreement constitutes the valid and enforceable obligations of the parties in accordance with its terms.

12.11. Governing Law. This Agreement shall be deemed to have been made and shall be construed and interpreted in accordance with the laws of the State of Ohio.

12.12. Gender and Number. As used in this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each include the others whenever the context so indicates.

12.13 Access to Books and Records. To the extent required by applicable laws and regulations, each of the parties hereto shall make their respective books, documents, and records available upon written request to the Controller General of the United States, the Secretary of Health and Human Services, the Ohio Department of Health, or the duly authorized representatives thereof to the extent required to verify the costs of services rendered by Manager pursuant to this Agreement for a period of four years following the rendition of such services by Manager hereunder. In the event that any of Manager's obligations under this Agreement are carried out through a permitted subcontractor with whom Manager has contracted, to the extent required under applicable laws and regulations, Manager shall require such subcontractor to make its books, documents and records available in the same manner.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

**"OWNER"**

Executive Health Drive Surgical and Diagnostic Center,
an Ohio limited liability company

By ________________________
Its Chairman

**"ASC"**

ASC Group, LC

By ________________________
Its PRESIDENT

**"MANAGER"**

ASC MANAGEMENT, L.L.C.

By ________________________
Its Member

## EXHIBIT "A"

## DESCRIPTION OF DEVELOPMENT AND MANAGEMENT SERVICES

*During the, pre-opening and operational phases of the Center, ASC and Manager will complete and perform the following development and management tasks and services for the Center:*

Preparation of Documentation needed for Compliance, Preparation of Policies and Procedures
Fiscal and Office Development and Insurance Set-up
Equipment Set-up, Purchasing and Management
Facility Practice Analysis and Development
Managed Care/Employer Contract Development and Maintenance
Office and Medical Staff Recruiting and Development
Materials and Supplies Cost Sourcing and Management
Implementation and Maintenance of Management Information Systems
*Business Office Staff Orientation, Training and Support
*On Site Billing, Collection and Monthly, Financial Reporting and In-House Accounting Services
JCAHO Accreditation
Facility Licensing, Medicare Certification
*Risk Management
*Credentialing
Physician Relations
Supervise Addition of New Investors
*Day-To-Day Management
Organization and Participation on Board of Managers
*Coding, Billing and Collections
Personnel Supervision
*Cash Management
Continuing Education for Staff
Strategic Planning/JV Marketing
Outcomes Program
Utilization Review/Profitability Maximization
Marketing
Vendor Contracting
Regulatory Compliance and Auditing
Building Management

* Represents those tasks which Owner may assume in order to reduce the management fee payable under Section 6.1(b).

# COURT OF COMMON PLEAS, ERIE COUNTY

323 Columbus Avenue, Sandusky, Ohio 44870

## SUMMONS

Rule 4 1970 Ohio Rules of Civil Procedure

**Case No. 2001 CV 224**

**Plaintiff(s):**
Northern Ohio Surgical Center LLC
2800 Hayes Ave Bldg E
Sandusky OH 44870

**SUMMONS ON COMPLAINT**

**vs.**

**Defendant(s):**
ASC Group LC a Utah limited liability company
% CT Corporation System
1300 E Ninth St
Cleveland OH 44114

ASC Management LLC a Utah limited liability etc
% CT Corporation System
1300 E Ninth St
Sandusky OH 44870

To the above named defendant(s):

You are hereby summoned that a complaint (a copy of which is hereto attached and made a part hereof) has been filed against you in this court by the plaintiff(s) named herein.

You are required to serve upon the plaintiff's attorney, or upon the plaintiff's if he/she has no attorney of record, a copy of your answer to the complaint within **28 days** after service of this summons upon you, exclusive of the day of service. Said answer must be filed with this court within three days after service on Plaintiff's Attorney.

The name and address of the plaintiff's attorney is as follows:

David Rodman Cooper Esq
Cooper & Walinski LPA
900 Adams St
Toledo OH 43624

If you fail to appear and defend, judgment by default will be taken against you for the relief demanded in the complaint.

**BARBARA J. JOHNSON, Clerk**

May 25, 2001
Z000000959

Carol A. Steele
By *Carol A Steele*, Deputy

SCANNED

7106 4575 1294 1294 9512

**TO:**

ASC Group LC a Utah limited
% CT Corporation System
1300 E Ninth St
Cleveland, OH 44114

**SENDER:**

**REFERENCE:** COMMON PLEAS
2001 CV 224

PS Form 3800, June 2000

| RETURN RECEIPT SERVICE | | |
|---|---|---|
| | Postage | 3.50 |
| | Certified Fee | |
| | Return Receipt Fee | |
| | Restricted Delivery | |
| | Total Postage & Fees | |

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE
5/25/01.

7106 4575 1294 1294 9505

**TO:**

ASC Management LLC a Utah l
% CT Corporation System
1300 E Ninth St
Cleveland, OH 44114

**SENDER:**

**REFERENCE:** COMMON PLEAS
2001 CV 224

PS Form 3800, June 2000

| RETURN RECEIPT SERVICE | | |
|---|---|---|
| | Postage | 3.50 |
| | Certified Fee | |
| | Return Receipt Fee | |
| | Restricted Delivery | |
| | Total Postage & Fees | |

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE
5/25/01

**IN THE COURT OF COMMON PLEAS, ERIE COUNTY, OHIO**

| | |
|---|---|
| Northern Ohio Surgical Center, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>ASC Group, LC and ASC Management, L.L.C.<br><br>Defendants. | Case No.: 2001-CV-224<br><br>**NOTICE OF FILING OF NOTICE OF REMOVAL**<br><br>Stephen B. Mosier (0019769)<br>Roetzel & Andress<br>One SeaGate, Suite 999<br>Toledo, OH 43604<br>Telephone: (419) 242-7985<br>Facsimile: (419) 242-0316<br><br>Counsel for Defendants ASC Group, LC and ASC Management, L.L.C. |

**PLEASE TAKE NOTICE** that ASC Group, LC and ASC Management, L.L.C. Defendants in the above-captioned case, have filed their Notice of Removal with the Clerk of the United States District Court for the Northern District of Ohio, Western Division, a copy of which is attached hereto as Exhibit "A".

ALL-STATE LEGAL®
EXHIBIT
B

Pursuant to 28 U.S.C. §1141 and 1446, these proceedings are to be removed to the United States District Court for the Northern District of Ohio, Western Division. Pursuant to 28 U.S.C. Section 1446(d), the state court shall proceed no further unless and until the case is remanded by the aforesaid United States District Court.

Stephen B. Mosier (0019769)

Attorney for Defendants ASC Group, LC
And ASC Management, L.L.C.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Notice of Filing Notice of Removal has been served via ordinary first class, United States Mail, postage prepaid, this 30th day of May, 2001, upon Gerardo R. Rollison, Esq., Cooper & Walinski, L.P.A., 900 Adams Street, Toledo, OH 43624, counsel for plaintiff Northern Ohio Surgical Center, LLC.

Stephen B. Mosier (0019769)

An Attorney for Defendants ASC Group,
LC and ASC Management, L.L.C.

38839_1